COMMONWEALTH of Pennsylvania,
Appellant

v.

Alwasi YONG, Appellee

No. 19 EAP 2016

Supreme Court of Pennsylvania.

Argued: March 7, 2017

Decided: January 18, 2018

Branden James Albaugh, Esq., Ronald Eisenberg, Esq., Lawrence Jonathan Goode, Esq., Edward F. McCann Jr., Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania, Appellant.

Daniel John O'Riordan, Esq., for Alwasi Yong, Appellee.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

## OPINION

JUSTICE MUNDY

We granted review to consider the parameters of what has been termed the collective knowledge doctrine.[1] The specific

---

1. The collective knowledge doctrine is some-   times referred to as the "fellow officer rule."

issue presented in this case is whether an investigating officer's knowledge of facts sufficient to create probable cause to arrest may be imputed to a second officer, who arrests the suspect, when the two officers are working as a team, but there is no evidence the investigating officer with probable cause directed the arresting officer to act. Under the version of the collective knowledge doctrine we adopt today, we conclude Yong's arrest was constitutional. Thus, we reverse the judgment of the Superior Court.

## I.

The following factual account was developed at the suppression hearing held on April 17, 2013. On September 21, 2011, at approximately 1:25 p.m., Philadelphia Police Officer Joseph McCook and his partner, Officer Israel Morales, of the Narcotics Field Unit were conducting surveillance in the vicinity of the 3200 block of North Fairhill Street in Philadelphia. N.T. Suppression Hr'g, 4/17/13, at 4–5. Officer McCook observed Officer Morales hand $120.00 of pre-recorded buy money to a confidential informant (CI). *Id.* at 5. The CI approached Yong, who was standing in front of 3202 North Fairhill Street, engaged in a brief conversation with him, and handed Yong the money. *Id.* After accepting the money, Yong walked over to Samuel Vega and gave it to him. *Id.* at 5–6. Vega then entered 3202 North Fairhill Street and emerged approximately two minutes later. *Id.* at 6. Vega handed the CI a small object. *Id.* Following the exchange, the CI returned to where Officers McCook and Morales were located. *Id.* He provided the officers with 12 clear, plastic packets, each with a "money symbol" stamped on it. *Id.* Officer McCook field-tested the packets' contents and determined they contained marijuana. *Id.* Officer McCook had worked in the Narcotics Field Unit for the previous 12 to 13 of his 18 years as a Philadelphia police officer. *Id.* at 13. He had been involved in "probably thousands" of narcotics investigations using confidential informants generally, and specifically, he had observed "hundreds" of transactions similar to the one observed on September 21, 2011, "[w]here one person would be the person accepting the money[.]" *Id.* at 12.

The following day, September 22, 2011, Officer Morales conducted surveillance of 3202, 3204, and 3213 North Fairhill Street without Officer McCook. *Id.* at 7–8. Officer Morales did not see Yong; however, 25 clear packets of marijuana were turned over to Officer McCook as a result of Officer Morales' investigation that day. *Id.* at 7–8. The packets were similar to the ones that were recovered the previous day. *Id.* at 7. On September 23, 2011, Officer McCook returned to the area of 3202 North Fairhill Street. *Id.* at 8. At approximately 1:15 p.m., he witnessed Officer Linwood Fairbanks, acting undercover, provide $40.00 of pre-recorded buy money to Vega. *Id.* at 9–10. Vega accepted the money, walked over to a lot situated at 3204 North Fairhill Street, retrieved an object from the dirt, and delivered it to Officer Fairbanks. *Id.* at 9. Yong was in the front of the property during the encounter between Officer Fairbanks and Vega, but he was not observed to be involved with this transaction. *Id.* at 10. Officer Fairbanks delivered to Officer McCook the items Vega had given him: eight packets with the same money symbols stamped on them. *Id.* at 9. Officer McCook field-tested the contents of the packets, and they were determined to contain marijuana. *Id.* at 10.

Following this transaction, Officer McCook left and "met up with the other

*See, e.g. United States v. Hinojos*, 107 F.3d 765, 768 (10th Cir. 1997).

officers to get ready ·to execute [and] to brief them on the execution of the search warrant" for 3202 North Fairhill Street. *Id.* at 17. The team of approximately six to eight officers entered the residence at 1:25 p.m. with Officer McCook toward the rear of the group. *Id.* at 10, 17. Yong was standing in the living room. *Id.* at 10, 17–18. As Officer McCook was entering the residence, Officer Gerald Gibson seized Yong, patted him down, and recovered a .38 caliber revolver from Yong's waistband. *Id.* at 17–18. A search of the shed on the property yielded 100 clear, plastic bags, each stamped with a money symbol and containing marijuana.[2] *Id.* at 11–12.

The Commonwealth charged Yong with a number of drug and firearms offenses including possession with intent to manufacture or deliver a controlled substance (PWID), firearms not to be carried without a license, persons not to possess a firearm, and criminal conspiracy to commit PWID.[3]

On September 7, 2012, Yong filed an omnibus pretrial motion in which he sought the suppression of physical evidence resulting from his seizure and arrest. Specifically, Yong argued his mere presence at the subject residence of the search warrant was insufficient to justify a protective pat-down or *Terry*[4] frisk. Yong further argued police lacked probable cause to arrest him.[5] The trial court held a suppression hearing at which Officer McCook testified to the above facts regarding the three-day surveillance of the property and the execution of the search warrant. The Commonwealth did not introduce the search warrant into evidence.

Counsel for Yong argued that there was no probable cause to arrest Yong because "[t]here was no evidence presented that Officer Gibson had any knowledge about what Mr. Young [sic] may have done. And such knowledge cannot be inferred from the evidence presented. There is nothing to show that anyone spoke to Officer Gibson and told him what they had seen on the 21st." *Id.* at 19–20. Counsel further argued that even if Officer Gibson had knowledge of the transaction involving Yong that occurred two days prior, such information did not establish probable cause for his arrest. Finally, counsel argued mere presence on the premises at the time police were executing a search warrant was insufficient to create a reasonable suspicion that Yong was armed and dangerous, relying on *In re J.V.*, 762 A.2d 376

---

**2.** Vega was arrested somewhere "out front of the property." N.T. Suppression Hr'g, 4/17/13, at 11. The $40.00 in pre-recorded money that Vega received from Officer Fairbanks and an additional $40.00 were recovered from his person. Ultimately, his case was dismissed pursuant to Pa.R.Crim.P. 1013 (governing the time in which trials must commence in municipal court). *See* Docket, MC–51–CR–0040839–2011.

**3.** 35 P.S. § 780–113(a)(30); 18 Pa.C.S. §§ 6106(a)(1), 6105(a), 903.

**4.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry*, the United States Supreme Court held "that an officer may conduct a limited, pat-down search for weapons when the officer has a reasonable suspicion that the individual is armed and dangerous." *Commonwealth v. Jackson*, 548 Pa. 484, 698 A.2d 571, 573 (1997); *accord Terry*, 392 U.S. at 27, 88 S.Ct. 1868.

**5.** This Court has explained probable cause to arrest as follows.

Probable cause to arrest exists when the facts and circumstances within the police officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.

*Commonwealth v. Burno*, 154 A.3d 764, 781 (Pa. 2017) (internal quotation marks and citation omitted).

(Pa. Super. 2000).[6] Thus, a protective-pat down of Yong was impermissible under Terry. *Id.* at 20–23.

The Commonwealth highlighted that this arrest was the product of an ongoing, three-day investigation during which Yong was observed on the first and third days in the area from where drugs were obtained. *See id.* at 27. It argued that there was "more than enough" for police to have searched Yong because the information about Yong's activity was known by "the arresting authority" which was "the Narcotics Field Unit." *Id.* at 27–28. The trial court credited the testimony of Officer McCook, and agreed with the Commonwealth. *Id.* at 25. Specifically, the court concluded as follows.

> Okay. I agree with the Commonwealth. I think I've stated my reasons on the record, that what is in the mind of the observer is imputed to that of all those who served the warrant. With the warrant, there was enough to search [Yong].[7] Even if they were searching for dope and they happened to find guns, it was a search incident to something that was found reasonable by a magistrate for them to go in there, and it was reasonable for them to go in there based on what they saw. [Yong] was in there, and he got searched. I believe it is different from the mere presence piece.
>
> So I will deny the motion to suppress.

*Id.* at 28–29.

On April 24, 2013, at the conclusion of a three-day trial, a jury convicted Yong of carrying a firearm without a license and conspiracy to commit PWID.[8] In a separate proceeding, the trial court found Yong guilty of persons not to possess a firearm. On June 12, 2013, the trial court sentenced Yong to an aggregate term of five to ten years' imprisonment.[9] On July 8, 2013, Yong filed a timely notice of appeal from his judgment of sentence.[10]

On appeal, Yong argued that the trial court erred in denying his motion to suppress because the arresting officer, Officer Gibson, had neither probable cause to arrest Yong nor reasonable suspicion to conduct a *Terry* frisk. However, he did not dispute that Officer McCook's first-hand

6. In *In re J.V.*, the Superior Court concluded, based on Pennsylvania and federal case law, "mere presence during the execution of a search warrant is insufficient ground, in and of itself, for a protective pat-down" under the Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution. *In re J.V.*, 762 A.2d at 382.

7. The trial court acknowledged the warrant was not in evidence. *Id.* at 23. Nevertheless, it "assumed" that it included the details of the surveillance between September 21 and 23, 2011, including identifying the people who were involved during the events of those days. *Id.* The trial court noted that Yong was present during the observed drug transactions on September 21 and September 23. *Id.*

8. The jury was unable to reach a decision regarding PWID. The Commonwealth *nolle prossed* that count.

9. The trial court sentenced Yong to a term of five to ten years' imprisonment for conspiracy and concurrent terms of imprisonment of five to ten years for persons not to possess a firearm and three and one-half to seven years for firearms not to be carried without a license, respectively.

10. Following the initiation of the direct appeal, Judge Kenneth Powell, who presided over both the suppression hearing and the trial, directed Yong to file a statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). Yong complied. Judge Powell filed a letter on October 23, 2013, stating he would file a Rule 1925(a) opinion upon receipt of the notes of testimony. On April 1, 2014, however, the trial court sent a letter to the Superior Court informing the court that no opinion would be forthcoming, as Judge Powell was no longer sitting as a judge in Philadelphia County.

knowledge of Yong's activity gave rise to sufficient probable cause to arrest. The Commonwealth countered that when a close group of officers are functioning as a team, the probable cause inquiry is based on an assessment of the collective knowledge of the team as a whole. Therefore, because the collective knowledge of the team amounted to probable cause to arrest Yong, the trial court did not err in denying Yong's suppression motion.

The Superior Court, in a published, majority opinion authored by now-Justice Wecht, began its analysis of this issue by outlining its standard of review in suppression matters, i.e., that appellate review is limited to determining whether the record supports the factual findings of the trial court and whether the legal conclusions drawn therefrom are correct. *See Commonwealth v. Yong*, 120 A.3d 299, 304 (Pa. Super. 2015). With respect to its scope of review, the court explained that it is confined to review "only the suppression hearing record, and [its review] excludes any evidence elicited at trial," relying on this Court's decision in *In re L.J.*, 622 Pa. 126, 79 A.3d 1073 (2013).[11] *Yong*, 120 A.3d at 304.

The court traced the origin of the collective knowledge doctrine to *Williams v. United States*, 308 F.2d 326 (D.C. Cir. 1962). *Yong*, 120 A.3d at 305. The appellant in *Williams* challenged the constitutionality of his arrest because the arresting officer knew "the appellant was wanted by the police" but did not have knowledge of "the details of the crime or why appellant was suspected of the crime." *Williams*, 308

F.2d at 327. In challenging his arrest, Williams conceded that another officer involved in the investigation had probable cause to arrest him; however, he argued his arrest was unlawful because the arresting officer "did not have adequate first hand [sic] information and was acting on only [another officer's] instructions." *Id.* Rejecting Williams' argument, the circuit court held, "in a large metropolitan police establishment the collective knowledge of the organization as a whole can be imputed to an individual officer when he is requested or authorized by superiors or associates to make an arrest." *Id.*

The Superior Court next referenced *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) opining that the United States Supreme Court echoed the reasoning of *Williams* in its analysis. *See Yong*, 120 A.3d at 305. In *Whiteley*, the United States Supreme Court addressed the constitutionality of an arrest by examining whether the information on which the arrest warrant was issued was sufficient to support a disinterested and independent magistrate's judgment that probable cause existed for the warrant. The Court concluded "the complaint on which the [arrest] warrant issued ... clearly could not support a finding of probable cause by the issuing magistrate." *Whiteley*, 401 U.S. at 568, 91 S.Ct. 1031. Thus, the Court ruled that Whiteley's arrest was unconstitutional. The state argued that, despite the inadequacy of the complaint to support the arrest warrant, the arresting police officers, members of a police force in Albany County, Wyoming were acting in

---

11. Although *In re L.J.* held that appellate courts must confine their review over suppression issues to the record developed at the suppression hearing, the Court did not garner a majority with respect to whether the rule of law should be applied retrospectively or prospectively. This Court has not resolved the discrete question of retroactivity of the new rule of law. However, the Superior Court subsequently embraced the plurality's proposed rule in *Commonwealth v. Eichler*, 133 A.3d 775 (Pa. Super. 2016) and held that the limited scope of rule applies only to cases commenced after *In re L.J.* was decided. *Eichler*, 133 A.3d at 779–80.

reliance on a radio bulletin that was broadcast over the state. *Id.* at 568, 91 S.Ct. 1031. The state reasoned that the arresting officers had probable cause to believe that Whiteley and another were the men described in the bulletin, and that it was reasonable for the officers to assume that the authority that issued the bulletin had probable cause to direct the arrest. *Id.* In disposing of this argument, the Court agreed that the officers were permitted to take action upon hearing the bulletin.

> We do not, of course, question that the [arresting] police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.

*Id.* at 568, 91 S.Ct. 1031. Because the complaint, on which basis the warrant was issued and the bulletin was sent, did not support a finding of probable cause, and because the arresting officer was without information tending to corroborate the tip which served as the foundation of the complaint, the Court ruled the arrest unconstitutional. *Id.* at 568–69, 91 S.Ct. 1031.

The Superior Court reasoned that reading *Whiteley* with *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), a subsequent United States Supreme Court case involving the appropriateness of relying on information relayed to officers of a police department from another department, "instruct[s] that the collective knowledge doctrine serves an agency function. When a police officer in-structs or requests another officer to make an arrest, the arresting officer stands in the shoes of the instructing officer and shares in his or her knowledge." *Yong*, 120 A.3d at 307.

In *Hensley*, a police informant told a St. Bernard, Ohio police officer that Hensley had driven the getaway car from an armed robbery that occurred six days prior in St. Bernard, a suburb of Cincinnati. The officer issued a "wanted flyer" to surrounding police departments. *Hensley*, 469 U.S. at 223, 105 S.Ct. 675. The flyer described Hensley and the offense for which he was sought, armed robbery, and requested that in the event he is encountered by a neighboring police department, he be picked up and held for the St. Bernard Police Department. *Id.* The police department in Covington, Kentucky, another suburb of Cincinnati, received the flyer and read it to the officers at the change of each shift. *Id.* Ultimately, Hensley was spotted by Covington police, who pulled him over while they determined if he was the subject of an arrest warrant. *Id.* at 224–25, 105 S.Ct. 675. The United States Supreme Court granted certiorari to determine the reasonableness of the stop and looked to its earlier decision in *Whiteley* for guidance.

> [L]anguage in *Whiteley* suggests that, had the sheriff who issued the radio bulletin possessed probable cause for arrest, then the [arresting] police could have properly arrested the defendant even though they were unaware of the specific facts that established probable cause. Thus *Whiteley* supports the proposition that, when evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who *issued* the flyer possessed probable cause to make the arrest. It does not turn on whether those relying on the flyer were themselves aware of

the specific facts which led their colleagues to seek their assistance. In an era when criminal suspects are increasingly mobile and increasingly likely to flee across jurisdictional boundaries, this rule is a matter of common sense: it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction.

*Id.* at 230–31, 105 S.Ct. 675 (emphasis in original) (citation omitted). The High Court concluded "if a flyer or a bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification[.]" *Id.* at 232, 105 S.Ct. 675.

The Superior Court noted that the *Whiteley* rationale was applied in *Commonwealth v. Kenney*, 449 Pa. 562, 297 A.2d 794 (1972) by this Court to uphold a warrantless arrest when the arresting officer was instructed by the lieutenant overseeing the entire investigation to arrest the appellant, and the lieutenant had sufficient probable cause to believe appellant committed a crime.[12] *See Yong*, 120 A.3d at 307. The court underscored that Pennsylvania courts have cited to *Whiteley* and *Hensley* for the notion that an arresting officer, lacking sufficient personal knowledge amounting to probable cause, may rely on direction from an officer possessing the requisite knowledge without running afoul of the Fourth Amendment. *See id.* (collecting cases). Deeming evidence of either a specific instruction or communica-

tion of the relevant probable cause information necessary to Pennsylvania's application of the collective knowledge doctrine, the majority concluded as follows.

Instantly, there is nothing in the suppression record to suggest that: (1) Officer McCook ordered or directed Officer Gibson to arrest Yong; or (2) Officer Gibson received information justifying Yong's arrest; or (3) Officer Gibson received information, which, coupled with the facts that he personally observed, provided probable cause to arrest Yong. This lack of evidence compels the conclusion that Officer Gibson—acting of his own accord—made a warrantless arrest. The fact that, unbeknownst to Officer Gibson, his colleague Officer McCook had observed Yong participate in a drug transaction two days earlier cannot suffice to permit the Commonwealth to leapfrog the Fourth Amendment.

*Id.*

The majority continued to explain that the courts of various jurisdictions have employed the collective knowledge doctrine under different factual circumstances falling into two general categories. A "vertical" application of the doctrine involves one law enforcement officer, possessing probable cause, instructing another officer, without the requisite knowledge, to act. *See id.* at 308 (explaining this approach is a direct application of *Whiteley* and *Hensley* and the approach Pennsylvania courts have used). The majority continued that a "horizontal" concept of the collective knowledge doctrine, by contrast, is broader. *Id.* The probable cause assessment is

---

**12.** *Kenney* differed from the facts of *Whiteley* and *Hensley* in that the arresting officer was directed by his own superior, who was overseeing the investigation, to make a warrantless arrest. As explained *supra, Whiteley* and *Hensley* involved fleeing suspects detained out-of-jurisdiction by police officers who became aware of the information through flyers or bulletins broadcast to different police departments by an investigating police department.

not focused on a single officer's knowledge; rather, probable cause is assessed by aggregating the knowledge of two or more law enforcement officials working together. *Id.* However, the majority opined that many of the courts utilizing the latter approach, "have ignored the original aim of the rule" by "eliminating the requirement that officers actually communicate with each other." *Id.* at 309. In declining to adopt the horizontal approach, the majority reasoned that "an expansive interpretation of the collective knowledge doctrine does not comport with the fundamental requirement that warrantless arrests be supported by probable cause." *Id.* Although the majority took the opportunity to expressly reject expanding the collective knowledge doctrine, it somewhat incongruously also concluded that the horizontal approach would not apply to the facts of this case because there was no evidence of communication between Officers McCook and Gibson. *Id.* at 310.

> Pennsylvania courts have never expanded the doctrine beyond the situation where a police officer who possesses probable cause instructs a fellow officer to act. We decline to adopt the "horizontal" approach to collective knowledge, which some federal courts have used to aggregate knowledge among police officers functioning as a team. In any event, even if Pennsylvania law recognized such a broad rule, the absence of any evidence that Officers Gibson and McCook actually communicated with one another would render the rule inapplicable to this case.
>
> We understand the trial court's temptation to infer that Officer McCook instructed Officer Gibson to arrest Yong. When a police officer observes a suspect

engage in criminal conduct and then a second police officer arrests the suspect, one might reasonably assume that the officers communicated with one another. The testimony presented at Yong's trial suggests that this is what occurred .... Nevertheless, as a matter of law our scope of review in suppression matters is limited to the suppression hearing record, and excludes any evidence elicited at trial. *In re L.J.*, 79 A.3d at 1085.

*Id.* at 310–11 (some citations omitted). Accordingly, the Superior Court reversed the trial court's denial of Yong's motion to suppress.[13]

Judge Anne Lazarus filed a concurring statement to the majority's treatment of Yong's suppression issue. In her view, the issue should have been resolved by determining whether Officer Gibson had probable cause, based on reasonably trustworthy information, to believe Yong was committing or had committed a crime. *Id.* at 313 (Lazarus, J., concurring). Because the record did not reflect that Officer Gibson had information that, paired with first-hand observation, gave rise to probable cause to arrest Yong, his arrest was unlawful. *Id.* As there was no evidence that an officer with probable cause instructed or authorized Officer Gibson, Judge Lazarus opined, there was no need to contemplate the contours of the collective knowledge doctrine. *Id.*

The Commonwealth filed a petition for allowance of appeal, and this Court granted review of the following issue:

> Did the Superior Court-in contravention of the United States Supreme Court precedent and overwhelming supporting authority from this Court, the Superior Court itself, and virtually every federal and state court-err in holding that the

---

**13.** Yong also challenged the sufficiency of the evidence supporting his conviction for criminal conspiracy to the Superior Court. The

court concluded there was ample evidence supporting the conviction. *Yong,* 120 A.3d at 312.

Fourth Amendment does not permit a member of a close group of officers working as a team to act on the collective knowledge of that team, absent a directive or instruction issued by an officer who possesses probable cause?

*Commonwealth v. Yong*, 635 Pa. 419, 137 A.3d 573 (2016) (per curiam).

## II.

The Commonwealth argues that the collective knowledge doctrine justifies Yong's arrest because "the police as a whole" possessed sufficient probable cause to effectuate the arrest. Commonwealth's Brief at 12. It is the position of the Commonwealth that the application of the collective knowledge doctrine does not require any directive or instruction by an officer with personal knowledge. *Id.* at 12–13. It continues that this Court and the United States Supreme Court have applied the doctrine, for decades, "to impute knowledge to an officer ... even where the acting officer does not personally know all, or even any, of the information necessary to establish probable cause." *Id.* at 13. The Commonwealth contends this Court's decision in *Commonwealth v. Jackson*, 548 Pa. 484, 698 A.2d 571 (1997) "implicitly recognized that the strength of the combined

knowledge of the investigating officers is what matters, not which officer instructed another to act." *Id.* at 16. The Commonwealth argues the great weight of authority from our sister states and federal circuit courts supports a more expansive interpretation of the collective knowledge doctrine. *See id.* at 17–23. Finally, the Commonwealth argues policy supports this approach and reflects the realities of police work where communication among officers may be subtle and nonverbal. *See id.* at 23–28.

Yong counters that the Superior Court correctly decided the issue "because there was no evidence that Officer Gibson either had probable cause to arrest Yong or was directed to arrest Yong by an officer who had probable cause." Yong's Brief at 14. He continues that Pennsylvania courts have not adopted the broader "horizontal version" of the doctrine and consistently have applied the "vertical version" as derived from *Whiteley*. *See id.* at 15–17. He likens the instant case to this Court's decision in *Commonwealth v. Queen*, 536 Pa. 315, 639 A.2d 443, 445 (1994),[14] and asserts his arrest suffered from "the same constitutional defect." *Id.* at 18. The core of Yong's argument is grounded in the lack of evidence that Officer McCook instructed

---

**14.** In *Queen*, a detective informed a fellow officer that the appellant "resembled a male wanted for robbery." *Queen*, 639 A.2d at 444. The officer to whom this comment was made then approached the appellant, asked him to exit his car, and ultimately frisked him and discovered a firearm. *Id.* At the appellant's suppression hearing the only Commonwealth witness to testify was the officer who frisked and arrested the appellant. This Court examined *Whiteley* and *Hensley* and concluded that evidence "establishing the articulable facts which support the reasonable suspicion" was required in order for the stop and frisk to be proper. *Id.* at 445. Because the detective instructing the officer did not testify, the suppression court was left to assume he had the requisite level of suspicion to effect an investi-

gative stop. *Id.* Accordingly, this Court reversed the order of the Superior Court affirming Queen's judgment of sentence, ordered the evidence suppressed, and remanded to the trial court for a new trial. *Id.* at 446. This Court was constrained to reverse in *Queen* because no evidence was offered to establish reasonable suspicion in the mind of the directing officer. In this case, the issue is not whether the requisite level of suspicion existed, but whether there was evidence that the arresting officer was directed to act by the officer with probable cause. As such, *Queen* is inapt under the present factual circumstances where it is unquestioned that Officer McCook possessed information establishing probable cause.

Officer Gibson to act: "[w]ithout that essential testimony, the government cannot establish that Officer Gibson had a constitutional reason to seize or search Yong." *Id.* at 18. Yong further observes the Superior Court decision in his case is in accord with the Eighth and Fourth Circuits, which have declined to adopt an expansive, horizontal framework. *Id.* at 22–24.

The Commonwealth filed a responsive brief, asserting Yong has offered "no justification for the Superior Court's limitation on the collective knowledge doctrine[.]" Reply Brief at 5. It acknowledges that this Court's decision in *Kenney* adopted the *Whiteley* rationale, but underscores that it "did not address, much less reject" a horizontal application of the doctrine." *Id.* at 6. The Commonwealth contends that *Queen* supports its view because in the instant case, unlike *Queen*, the officer who possessed knowledge of the relevant facts testified at the suppression hearing. *Id.* at 7–8. The Commonwealth reiterates that endorsing the Superior Court's rationale would hinder coordinated police efforts. *Id.* at 8–14.

### III.

The collective knowledge doctrine's development in case law has created, broadly speaking, two formulas. The vertical approach has been applied with little controversy and finds support in the Supreme Court's decision in *Whiteley* and this Court's decision in *Kenney*. In *Kenney*, this Court concluded that when an officer makes an arrest on the direction of another officer, "the operative question" is not whether the arresting officer had independent probable cause to arrest but whether the officer who ordered the arrest had sufficient information to support probable cause. *See Kenney*, 297 A.2d at 796. Indeed, in support of the imputation of knowledge from an officer with probable cause to another carrying out a directive to arrest, we relied on the *Whiteley* Court's reasoning. *See id.* n.3. The doctrine applied in this manner reflects the realities of police work and the need for swift action and justifiable reliance on communications in order to efficiently perform the duties attendant to law enforcement. *See, e.g., Whiteley*, 401 U.S. at 568, 91 S.Ct. 1031 (stating, "[c]ertainly police officers ... are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause"); *Hensley*, 469 U.S. at 231, 105 S.Ct. 675 ("this rule is a matter of common sense: it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police officers in one jurisdiction to act promptly in reliance on information from another jurisdiction."); *see also Daniels v. United States*, 393 F.2d 359, 361 (D.C. Cir. 1968) ("[t]here is no requirement that the arresting officer have sufficient firsthand knowledge to constitute probable cause. It is enough that the police officer initiating the chain of communication" has information that amounts to probable cause.); *United States v. Burton*, 288 F.3d 91, 99 (3d Cir. 2002) ("the arresting officer need not possess an encyclopedic knowledge of the facts supporting probable cause, but can instead rely on an instruction to arrest delivered by other officers possessing probable cause."). This approach in assessing whether a warrantless seizure meets Fourth Amendment standards has been said to be "the best compromise" for determining whether an arrest by an officer without reasonable suspicion or probable cause is lawful because it reflects the need for a "middle ground" between affording the police some flexibility in enforcing the law and adhering to a rigid probable cause standard to protect citizens from unreasonable intru-

sions. Derik T. Fettig, *Who Knew What When? A Critical Analysis of the Expanding Collective Knowledge Doctrine*, 82 UMKC L. REV, 663, 671–72; *see also* Simon Stern, *Constructive Knowledge, Probable Cause, and Administrative Decisionmaking*, 82 NOTRE DAME L: REV. 1085, 1098 (2007) (highlighting in a "fast-paced situation" where police are pursuing several suspects, requiring "that others cannot take up chase until they receive detailed information about every suspect, ... would be counterproductive.").

In contrast to the relatively non-controversial, vertical approach, the horizontal approach "represents a broad expansion of the doctrine's scope" and has led to circuit splits in its adoption. *See id.* at 672. This formulation "subsumes situations where a number of individual law enforcement officers have pieces of the probable cause puzzle, but no single officer possesses information sufficient for probable cause.... In such situations, the court must consider whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold." [15] *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008). However, not every application of a purely non-vertical approach arises in the same factual manner. Some courts applying the collective knowledge doctrine impute knowledge in the absence of an explicit direction to act or transfer of information so long as there is "some communication" among the officers and they are acting in a coordinated investigation. In *United States v. Randy Terry*, 400 F.3d 575 (8th Cir. 2005), for example, officers were responding to a call to investigate a domestic disturbance. Upon briefly detaining Terry based on the description of his vehicle, one officer observed ammunition and searched Terry's truck, uncovering contraband. Contemporaneously, another officer, who at the time was speaking to Terry's wife, had knowledge of a protective order against Terry. Terry argued that the officer who searched his vehicle could not have done so in accord with Fourth Amendment protections because the "incriminating nature of the ammunition could not have been immediately apparent" without knowledge of the protective order. *Id.* at 580. The Eighth Circuit noted the district court's finding that the searching officer had knowledge of the protective order was "not entirely without foundation in the record." *Id.* However, it continued that under its approach to the collective knowledge doctrine, the actual knowledge of the searching officer, or whether he was acting at the direction of another officer's command, were not dispositive of the Fourth Amendment inquiry.

> Where officers work together on an investigation, we have used the so-called "collective knowledge" theory to impute knowledge of one officer to others. *United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir. 2001), *cert. denied*, 534 U.S. 982, 122 S.Ct. 415, 151 L.Ed.2d 316 (2001). We impute information if there has been "some degree of communication" between the officers. *United States v. Gonzales*, 220 F.3d 922, 925 (8th Cir. 2000). This requirement distinguishes officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject. *See Gillette*, 245 F.3d at 1034.

*Id.* at 581.

The Ninth Circuit observed that it was "willing to aggregate the facts known to

---

**15.** Although generally broken into two distinct frameworks, the *Chavez* court explained in certain situations, "the 'horizontal' and 'vertical' collective knowledge categories are by no means mutually exclusive." *Chavez*, 534 F.3d at 1345 n.12.

each of the officers involved" in an investigation to meet the constitutional level of suspicion to act. *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007). It highlighted that it would permit aggregation when there had been " 'communication among agents.' " *Id.* (citation omitted). However, "[a]t the same time, [the Ninth Circuit has] applied the collective knowledge doctrine 'regardless of whether [any] *information* [giving rise to probable cause] was actually communicated to' the officer conducting the stop, search or arrest." *Id.* (citations omitted some alterations in original). The core inquiry appears to center on whether the officers are working with each other and not whether a command or directive was given by an officer with probable cause nor an assessment of the nature of the communication. *See United States v. Bernard*, 623 F.2d 551, 561 (9th Cir. 1979) (concluding the information known to three officers could be aggregated to form probable cause because "the agents were working in close concert"); *United States v. Stratton*, 453 F.2d 36, 37 (8th Cir. 1972) ("the knowledge of one officer is the knowledge of all and that in the operation of an investigation or police agency[,] the collective knowledge and the available objective facts are the criteria to be used in assessing probable cause").

The rationale underpinning a requirement that there be some form of communication in a coordinated police effort seems to reflect an assumption that if there is some communication, it may be inferred that sufficient knowledge was communicated to justify the police action. Stern, *Constructive Knowledge, Probable Cause, and Administrative Decisionmaking*, 82 NOTRE DAME L. REV. at 1110. The rule which does not require any communication among officers, however, "appears to reflect a different premise-namely, that officers working together are acting as a "single organism." *Id.* (footnote omitted).

■ Here, we are not presented with a case where numerous officers hold "a piece of the probable cause puzzle" and no officer alone has sufficient probable cause. *See Chavez*, 534 F.3d at 1345. We must address whether the knowledge of a single officer with probable cause may be imputed to another officer where there is undisputed evidence that they were acting as a team, but there is no evidence the knowledge-holding officer gave a command to the officer who lacked probable cause or conveyed the information which gave rise to probable cause. Under the theory articulated by *Randy Terry*, actual direction is not required; neither is there a requirement that the communications between officers be examined, if it can be demonstrated that the officers who seek to justify their actions under the collective knowledge doctrine are working in a coordinated investigation and not as independent law enforcement personnel or agencies coincidentally or contemporaneously investigating the same crime. Applying this permutation of the horizontal approach to the instant case would result in reversal of the Superior Court decision because the record developed at the suppression hearing clearly reflects that the officers were involved in a coordinated effort to execute a search warrant and that Officer McCook met with his fellow officers prior to entering 3202 North Fairhill Street to "brief" them on the mission. N.T. Suppression Hr'g, 4/17/13, at 17. However, under any approach that permits aggregation of unspoken information or justifies actions taken absent direction from a person with the necessary level of suspicion, there remain serious concerns for protecting citizens from unconstitutional intrusions. In *United States v. Massenburg*, 654 F.3d 480 (4th Cir. 2011), the Fourth Circuit instructively summarized the purpose of the collective

knowledge doctrine and its benefits and hazards under the different formulations.

No case from the Supreme Court … has ever expanded the collective knowledge doctrine beyond the context of information or instructions communicated ("vertically") to acting officers. Some of our sister courts have authorized "horizontal" aggregation of uncommunicated information. *See United States v. Ramirez*, 473 F.3d 1026, 1032–33 (9th Cir. 2007) (collecting cases). . . .

The rationale behind the Supreme Court's collective-knowledge doctrine is, as the Court noted in *Hensley*, a "matter of common sense: [the rule] minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions [or officers] and enables police … to act promptly in reliance on information from another jurisdiction [or officer]." *Hensley*, [U.S.] 469 U.S. at 231, 105 S.Ct. 675. Thus, law enforcement efficiency and responsiveness would be increased[.] . . .

The Government's proposed aggregation rule serves no such ends. Because it jettisons the present requirement of communication between an instructing and an acting officer, officers would have no way of knowing *before* a search or seizure whether the aggregation rule would make it legal, or even how likely that is. The officer deciding whether or not to perform a given search [or seizure] will simply know that she lacks cause; in ordinary circumstances, she will have no way of estimating the likelihood that her fellow officers hold enough uncommunicated information to justify the search. And as an officer will never know *ex ante* when the aggregation rule might apply, the rule does not allow for useful shortcuts when an officer knows an action to be legal, as *Hensley* did. Perhaps an officer who knows she lacks

cause for a search will be more likely to roll the dice and conduct a search anyway, in the hopes that uncommunicated information existed. But as this would create an incentive for officers to conduct searches and seizures they believe are likely illegal, it would be directly contrary to the purposes of longstanding Fourth Amendment jurisprudence.

*Massenburg*, 654 F.3d at 494.

In light of these concerns, we cannot acquiesce to the Commonwealth's request to broadly interpret the collective knowledge doctrine and adopt an unrestricted horizontal application. Indeed, the United States Supreme Court has explained that the very purpose served by the exclusionary rule is to deter illegal searches and seizures. *See Commonwealth v. Arter*, 637 Pa. 541, 151 A.3d 149, 153–5 (2016). Accordingly, we will not endorse an approach that has the potential of encouraging police without the requisite level of suspicion to infringe on a person's freedom of movement in the hopes that his or her fellow officers possess such level of suspicion. *See Massenburg*, 654 F.3d at 494.

Although we decline to adopt a sweeping rule authorizing the imputation of knowledge between officers without direction or communication, this case presents us with what we regard as a modest amplification of the vertical application of the collective knowledge doctrine. In the instant case it is undisputed Officer McCook had probable cause to arrest Yong, and that Officer Gibson was with Officer McCook at the scene working to execute the search warrant after Officer McCook had briefed him and his companions on the efforts, at the time Officer Gibson arrested Yong. *See* N.T. Suppression Hr'g, 4/17/13, at 4–5. This case bears similarity to *United States v. Ragsdale*, 470 F.2d 24 (5th Cir. 1972). In *Ragsdale*, two officers conducted a traffic

stop based on Ragsdale's speeding. Upon asking Ragsdale to exit his vehicle, Officer Jones observed a hand gun in the car. Officer Jones whispered this to his partner, Officer Mullens; however, he admittedly did not hear the comment, but nevertheless undertook a warrantless search of the vehicle. Looking to the knowledge of the officers individually and collectively, the Fifth Circuit reasoned:

> If the possession of probable cause on the part of the searching officer were the alpha and omega of our inquiry the answer might be different. However, logic requires that we refocus on the broader concept—reasonableness. Unless Jones was to be derelict in his duty, Ragsdale's car had to be searched and had to be searched before Ragsdale could be allowed to return to it, and had to be searched during the moments that he was properly detained at this solitary and detached location. If Mullens had not commenced the search when he did, Jones would surely have commanded it, or would have put Ragsdale in Mullens' custody and performed it himself. There is just no way to characterize this search when and where it was made in any manner other than a reasonable one. It invaded no Fourth Amendment protection which Ragsdale could claim.
>
> Reasonableness—as its more usual concomitant, probable cause—is founded not on technicalities, but on "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Factually and practically the search at this precise point in time and space was mandated by Jones' view of Ragsdale's gun. The fact that one member of the team moved too swiftly, which sometimes invalidates the result, should not thwart the proof of

truth here where there existed a clear justification, and indeed demand, for the prompt search made. On this night and at this spot it would be hypertechnical to insist on bifurcating the knowledge of the officers and isolating Mullins from the realities of the existing situation.

*Ragsdale*, 470 F.2d at 30.

The Fifth Circuit's reasoning has been invoked in similar cases where the facts and circumstances make clear that the officer whose conduct was challenged is in close proximity to the officer who possesses probable cause. *See e.g., Smith v. State*, 719 So.2d 1018, 1024 (Fla. Dist. Ct. App. 1998) (noting had the officer who performed the challenged pat-down not done so, he would certainly have imminently been ordered to by the officer in close proximity who had reason to effect a constitutional pat-down).

Equally as in *Ragsdale*, it would be hyper-technical to insist on bifurcating the knowledge of Officers McCook and Gibson and isolating Officer Gibson from the realities of the existing situation where the officers were working together and it is apparent the challenged conduct would have inevitably been undertaken if Officer Gibson had not acted too swiftly. *See Ragsdale*, 470 F.2d at 30. Officer McCook would certainly have been derelict in his duties had he executed the search warrant with his team and failed to arrest Yong or to order his arrest when he had probable cause to do so.[16]

■ Accordingly, we maintain that Pennsylvania adheres to the vertical approach of the collective knowledge doctrine, which instructs that an officer with the requisite level of suspicion may direct another officer to act in his or her stead. *See Kenney*, 297 A.2d at 796. However,

---

**16.** The Superior Court noted that a review of the entire record suggests that Officer McCook indeed directed Yong's arrest. *See Yong*, 120 A.3d at 311.

where, as here, the arresting officer does not have the requisite knowledge and was not directed to so act, we hold the seizure is still constitutional where the investigating officer with probable cause or reasonable suspicion was working with the officer and would have inevitably and imminently ordered that the seizure be effectuated. We echo that not all factual circumstances fit squarely within a purely vertical or horizontal framework, see Chavez, 534 F.3d at 1345 n.12, and we find this modified approach best balances the important interest of ensuring police efficacy and efficiency with protecting citizens' rights to be free from unconstitutional intrusions. Applying this approach to this case, we conclude that Yong's Fourth Amendment rights were not violated.

The judgment of the Superior Court is reversed.

Chief Justice Saylor and Justices Baer and Dougherty join the opinion.

Justice Donohue files a dissenting opinion in which Justice Todd joins.

Justice Wecht did not participate in the consideration or decision of this case.

JUSTICE DONOHUE, Dissenting

The Majority today announces a new rule that permits uncommunicated knowledge of one police officer to justify an arrest conducted by another officer. In my view, the absence of a communication or directive by an officer with probable cause to the arresting officer renders the arrest unconstitutional.

As the Majority observes, the collective knowledge doctrine was first recognized by the United States Supreme Court in Whiteley v. Warden, 401 U.S. 560 (1971), wherein the Court stated that a police officer is entitled to rely on a communication or directive from another law enforce-

ment official to effectuate an arrest, and that arrest will be deemed lawful so long as the communicating officer had probable cause, despite the fact that the specific information giving rise to probable cause was not relayed to the arresting officer. Id. at 568. This created an exception to the traditional requirement that the arresting officer have probable cause to arrest an individual. See United States v. Watson, 423 U.S. 411, 423 (1976). In United States v. Hensley, 469 U.S. 221 (1985), the high Court reaffirmed its adherence to the collective knowledge doctrine, identifying it as a "common sense" rule because "it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction." Id. at 231.

This Court first applied the collective knowledge doctrine in Commonwealth v. Kenney, 297 A.2d 794 (Pa. 1972). In Kenney, we stated that because the arresting officer was "carrying out the order of his superior officer," and "did not undertake on his own initiative to arrest" the defendant, the question concerning the legality of the arrest centered on whether the superior officer issuing the command "had knowledge of facts and circumstances sufficient to constitute probable cause to arrest." Id. at 796. This traditional version of the collective knowledge doctrine is now commonly referred to as "vertical" collective knowledge and requires a communication between the officer with the requisite knowledge and the officer taking action based on the communication. It has been consistently adhered to and utilized in cases decided by this Court. See, e.g., Commonwealth v. Jackson, 698 A.2d 571, 576 n.3 (1997); Commonwealth v. Queen, 639 A.2d 443, 445-46 & n.4 (Pa. 1994); Commonwealth v. Wagner, 406 A.2d 1026, 1030 n.5 (Pa. 1979).

Other jurisdictions, however, have adopted a far more expansive approach, known as "horizontal" collective knowledge. The horizontal version permits the suppression court to aggregate, after the fact, the collective information known to a group of police officers working together as a single operating unit or a team. Under the horizontal approach, the legality of the search depends not on any particular officer's level of knowledge at the time of the search or arrest, but on whether, in hindsight, the disparate pieces of uncommunicated information known by different officers, taken together, give rise to a finding of probable cause. *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1228 n.5 (10th Cir. 2008).

This Court has never adopted or applied the horizontal approach. As stated in the Superior Court's decision in the case at bar, "Extending the collective knowledge doctrine to apply in the absence of a directive or instruction to arrest issued by an officer who possesses probable cause serves none of the legitimate law enforcement purposes behind the rule." *Commonwealth v. Yong*, 120 A.3d 299, 308-09 (Pa. Super. 2015). The Majority here rejects the Commonwealth's request for this Court to adopt the horizontal approach to collective knowledge based on its concern that it "has the potential of encouraging police without the requisite level of suspicion to infringe on a person's freedom of movement in the hopes that his or her fellow officers possess such level of suspicion." Majority Op. at 888 (citing *United States v. Massenburg*, 654 F.3d 480, 494 (4th Cir. 2011)).

The Majority recognizes that "under **any approach** that permits aggregation of unspoken information or justifies actions taken absent direction from a person with the necessary level of suspicion, there remain serious concerns for protecting citizens from unconstitutional intrusions." *Id.* at 887 (emphasis added). And yet, the holding announced by the Majority creates just such an approach and threatens citizens with unconstitutional intrusions. The Majority holds that an arrest made by an officer without the requisite knowledge passes constitutional muster simply because another officer who possesses the necessary information to effectuate a lawful arrest is also present at the scene. This rule requires no communication between the arresting officer and the one with the requisite probable cause, and "justifies actions taken absent direction from a person with the necessary level of suspicion."

There may be some facial appeal to the Majority's new rule. Given his proximity, Officer McCook, the officer with the requisite (but uncommunicated) knowledge in the case at bar, would likely have arrested and searched Yong, or issued a directive that another officer do so had Officer Gibson not acted. *Id.* at 889; *see* N.T., 4/17/2013, at 11. However, the contours of Fourth Amendment protections cannot be derived from idiosyncratic facial appeal.

The exception announced by the Majority could swallow probable cause requirements since as long as a hindsight evaluation reveals that the officer with knowledge was in some respects "available" to direct the officer who conducted the arrest, the acting officer need not have any information that would otherwise permit him or her to infringe upon an individual's right to be free from unreasonable searches and seizures. In my view, the Majority's pronouncement is equally as likely as the horizontal application of collective knowledge to "encourag[e] police without the requisite level of suspicion to infringe on a person's freedom of movement in the hopes that his or her fellow officers possess such level of suspicion." Majority Op. at 888.

Such an expansion of this holding is particularly likely because the Majority identifies its novel rule as a "version of the collective knowledge doctrine," terming it a "modest amplification of the vertical application" of that doctrine. *Id.* at 876, 888. In my view, this rule bears no resemblance to vertical collective knowledge because there is no communication whatsoever such that probable cause could be imputed from one officer to another. As discussed, a communication is the hallmark of vertical collective knowledge. Instead, the rule announced by the Majority more closely aligns with a horizontal application of collective knowledge, as it permits a hindsight review of what other officers were aware of at the time of the arrest, despite the fact that there was nothing communicated directly to the arresting officer to justify an arrest under the Fourth Amendment.

The Majority posits that it would be "hyper-technical" to suppress the evidence obtained from Yong as a result of Officer Gibson's actions. *Id.* at 889. To me, it is not hyper-technical to adhere to the probable cause standard to ensure the protection of a citizen's right to be free of unreasonable search and seizure. The facts of record here reveal that an officer, without probable cause, arrested an individual, searched his person and recovered a firearm from his waistband. N.T., 4/17/2013, at 11, 17-18. I agree with the Superior Court majority that the police conduct required the suppression of the evidence and I would affirm on the basis of the rationale expressed in the opinion authored by then-judge, now-Justice Wecht. Accordingly, I dissent.

Justice Todd joins this dissenting opinion.