[J-5-2025] [MO: Dougherty, J.]
**IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 37 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 1721 EDA |
| | : | 2022 entered on July 28, 2023, |
| v. | : | affirming the Judgment of Sentence |
| | : | of the Philadelphia County Court of |
| | : | Common Pleas at No. CP-51-CR- |
| ANTHONY LEWIS, | : | 0007345-2021 entered on June 30, |
| | : | 2022 |
| Appellant | : | |
| | : | ARGUED:  March 4, 2025 |

### DISSENTING OPINION

**JUSTICE DONOHUE**                               **DECIDED: September 25, 2025**

The Commonwealth asks this Court to bless law enforcement's reliance on the assertion of a "high-crime area" to establish reasonable suspicion.  For the reasons stated in my Opinion in Support of Reversal ("OISR") in *Commonwealth v. Jackson*, 302 A.3d 755 (Pa. 2023), in my view, the Commonwealth failed to establish the existence of a high-crime area.  More fundamentally, even if the designation was warranted by the evidence, the Commonwealth relied on the "high-crime area" designation in circumstances where it has no relevance.  Though irrelevant to the circumstances of this case, the factor was considered by the lower courts as a factor tipping the scales in favor of justifying a Fourth Amendment seizure.  I would reverse.

In this case, two officers, Officers Whatley and Brush, were on a routine patrol when they saw four or five men, including Lewis, "standing outside their houses."  N.T., 12/8/2021, at 9.  Officer Whatley observed that "They were on the sidewalk standing

around the steps of the house the steps onto the front door. … And they appeared to be gambling." N.T. 12/8/2021, at 9. He saw the group of men standing close together as if in conversation and he believed he saw "money in some of the individuals' hands as well as cards in other individuals' hands." *Id.* Lewis had a black leather bag across his body, and he was "within the group of individuals that were [gambling]," but neither Officer saw Lewis gambling. *Id.* at 13 ("I don't recall if I saw him specifically gambling but he was within that group of individuals that were"), 21-23 (asked whether he saw Lewis gambling, Officer Brush testified "I did not"). Officer Whatley, who had been assigned to this sector of the City of Philadelphia for his daily patrols for the entirety of his three years on the police force, testified that this area "is known for narcotics sales, [and] gambling goes on in that area." *Id.* at 11. Both Officers testified specifically about carjackings and criminal activity in the neighborhood occurring in the area after the seizure. *Id.* at 11, 20, 23.[1] Neither officer had made any arrests for gambling in that area. *Id.* at 14.[2]

The Officers drove up and pulled over their marked patrol car. Then, when Officer Brush opened the car door, "all the males looked up and immediately fled in all different directions," including Lewis. *Id.* at 10, 13. Officer Brush pursued Lewis and eventually caught up to him, by which time Lewis had thrown away his black leather bag. *Id.* at 17. Shortly thereafter, Officer Brush recovered Lewis's black leather bag containing a firearm. *Id.* at 18.

Lewis sought suppression of the firearm on the basis that he was unlawfully seized when Officer Brush pursued him and therefore, his "abandonment" of the firearm was

---

[1] As the Majority correctly explains, criminal activity occurring **after** the seizure does not inform our analysis of whether reasonable suspicion existed at the time of the seizure. Majority Op. at 27 n.13.

[2] According to the officer's testimony, gambling on the street is generally illegal in Philadelphia. N.T., 12/8/2021, at 11.

coerced. Lewis's argument relies on the well-established principle of Pennsylvania constitutional law that chasing an individual who flees is a seizure and therefore requires reasonable suspicion or probable cause.[3] Lewis maintains that the Officers lacked reasonable suspicion to justify their pursuit. The Commonwealth contends that reasonable suspicion was established based on three factors: this was a high-crime area, Lewis was within a group of men who appeared to be gambling, and Lewis fled. The trial court denied suppression on the grounds that "reasonable suspicion was created by [Lewis's] unprovoked flight in a high crime area." Trial Court Opinion, 12/13/2022, at 4. The Superior Court deferred to the trial court's determination that this was a high-crime area and found that the "unprovoked flight, combined with the high crime area and the officer's observation of purported gambling, supported reasonable suspicion justifying an investigatory detention." *Commonwealth v. Lewis*, 2023 WL 4842305, at *3 & n.2 (Pa. Super. 2023) (non-precedential decision). This Court granted review of two questions:

> 1. Was the evidence sufficient to establish a high crime area, which, in addition to Petitioner's flight upon observing the arrival of police officers, provided the basis for the Superior Court's determination that the police possessed reasonable

---

[3] In the case of *California v. Hodari D.*, 499 U.S. 621 (1991), the United States Supreme Court determined that a police officer's pursuit of a juvenile (Hodari) was not a seizure such that the drugs Hodari tossed while being chased were not subject to suppression. Justice Scalia wrote for the Majority that "[a]n arrest requires **either** physical force … **or**, where that is absent, **submission** to the assertion of authority." *Id.* at 626; *see also id.* at 627 ("Since policemen do not command 'Stop!' expecting to be ignored, or give chase hoping to be outrun, it fully suffices to apply the deterrent [of the exclusionary rule] to their genuine, successful seizures."). Thus, under the Fourth Amendment, an individual is not seized until he complies with the directive or is physically seized. *Id.* at 629. However, in *Commonwealth v. Matos*, 672 A.2d 769 (Pa. 1996), this Court rejected the *Hodari D.* standard as inconsistent with the protections of the Pennsylvania Constitution. Based on *Matos*, pursuit by an officer is a seizure triggering the reasonable suspicion requirement. It follows that when an individual tosses contraband while being pursued, unless the officer demonstrates either probable cause or reasonable suspicion, the abandonment is coerced and subject to suppression. *Id.* at 771.

suspicion for a seizure that occurred when the police pursued Petitioner?

2. Did the Superior Court err in concluding that Petitioner's abandonment of the bag from which a firearm was recovered was not coerced by illegal police action, thereby requiring suppression of the firearm?

*Commonwealth v. Lewis*, 316 A.3d 984, 985 (Pa. 2024) (per curiam). This Court is thus called upon to clarify the quantum of evidence sufficient to establish a high-crime area and its role in a reasonable suspicion analysis.[4]

As I have stated elsewhere, "[w]here the existence of reasonable suspicion depends in any meaningful way on the characteristic of a neighborhood as being a disproportionately crime-ridden neighborhood, the Commonwealth bears the burden of proving that there is, in fact, significant crime occurring in that neighborhood." *Jackson*, 302 A.3d at 757 (Donohue, J., OISR). This first part of a high-crime area assessment entails consideration of the data including the police reports and objective observations. The present record contains no objective evidence to support that Lewis was in a high-crime area. The officers used only the magic words and no objective data establishing that this was actually a high-crime area when they stated that the area was known for its high-crime rate, N.T., 12/8/2021, at 20, referred to it as a "dangerous area," *id.* at 23, and stated that the area is known for gambling, *id.* at 11-12. Neither Officer provided any data to suggest that this was an area disproportionately high in crime. Thus, based on my reasoning in *Jackson*, I would reverse the lower court's decision on this basis alone.

But more fundamentally, the designation was utterly irrelevant in the circumstances of this case to establish reasonable suspicion. Consistent with

---

[4] My analysis is confined to the two issues on which we granted review. I share the Majority's view that this is not the appropriate case to address the unpreserved constitutional issue. *See* Majority Op. at 15-16 n.9.

foundational principles of evidence, after law enforcement support their assertion that particular criminal activity is prevalent in the area as compared to other areas, they must make a showing of relevance. *See Jackson*, 302 A.3d at 758 (Donohue, J., OISR) ("[I]n addition to proving that the neighborhood is disproportionately affected by the criminal activity, the Commonwealth must demonstrate that the criminal activity is relevant to the officer's suspicions."). Evidence is relevant where it has a tendency to make a fact more or less probable and where the fact is of consequence. Pa.R.E. 401. As this Court stated with regard to probable cause assessments, "a factor becomes relevant only because it has some connection to the issue at hand." *Commonwealth v. Thompson*, 985 A.2d 928, 936 (Pa. 2009). Thus, the Commonwealth must demonstrate that the prevalent criminal activity alleged is relevant to the officer's suspicions in this case.

The typical high-crime area case involves the government citing the characteristics of a neighborhood to help explain inferences drawn from otherwise ambiguous behavior. In *Jackson*, I explained that an officer seeing a woman walking away from a large cement wall with a spray-paint can in her pocket might draw a certain inference if the neighborhood is one with a significant and disproportionate graffiti problem. *Jackson*, 302 A.3d at 761 (Donohue, J., OISR). Our case law illustrates the point: on a street corner known for illegal gun activity, an officer might draw an inference that a bulge in a coat appeared to be a gun, *Commonwealth v. Carter*, 105 A.3d 767, 771 (Pa. Super. 2014), or in a neighborhood with a significant incidence of drug related arrests, that the area has significant drug crime might help explain an officer's perception that there were drugs in a baggie placed in a defendant's pocket, *Commonwealth v. E.M.*, 735 A.2d 654, 659 (Pa. 1999), or it may be used to support an officer's inference that a hand-to-hand transaction in an area with pervasive narcotics sales was likely a narcotics sale, *Commonwealth v. Clemens*, 66 A.3d 373, 380 (Pa. Super. 2013). Where the circumstances involve

behavior that is suggestive but ambiguous, the characteristics of the neighborhood clarify what the officer is witnessing.

Troublingly, our courts have been allowing the Commonwealth to inject "high-crime area" in cases where it does not explain anything. Our recent decision in *Barr* provides an apt illustration. Though the Majority cites *Barr* as an example of this Court correcting the overuse of the high-crime area designation, Majority Op. at 16-17 (citing *Barr*, 266 A.3d 25), it omits the critical legal conclusion. There, police stopped Barr's car for a minor traffic violation and subsequently searched the vehicle based on the odor of marijuana and the fact that the stop took place in a high-crime area. This Court explained that it was "of no moment" that the stop occurred in a high-crime area. *Barr*, 266 A.3d at 44. Using "of no moment," a phrase synonymous with irrelevant, this Court reminded lower courts and the Commonwealth of the need to show that the designation is of moment or relevant. We said that "the characteristics of the neighborhood where the troopers stopped the vehicle **are legally irrelevant** to whether the troopers had probable cause to search the vehicle." *Id.* (emphasis added). Thus, the lesson to be drawn from *Barr* is not just that the high-crime area designation is overused—which it is. The lesson is that a high-crime area designation must be accompanied by a showing of how the designation tends to make a fact of consequence more or less probable. Otherwise, the designation is simply irrelevant. "Absent a connection between the prevalent crime and the suspected crime, 'a crime-prone' neighborhood does not increase the probability that a particular crime is being committed." *Jackson*, 302 A.3d at 761. (Donohue, J., OISR) (citing Sheri L. Johnson, *Race and the Decision to Detain a Suspect*, 93 YALE L.J. 214, 222 n.42 (1983)).

Here, referring to this area as a high-crime area or a high-gambling crime area when assessing the existence of reasonable suspicion is a red herring because it does

not impact the totality of the circumstances analysis. Assume that the Commonwealth presented incontrovertible evidence establishing illegal gambling rampant and disproportionate in this area compared to other areas of Philadelphia. Regardless of the pervasiveness of gambling, Officer Whatley's testimony about what he observed was uncontested. He saw a group of men engaged in illegal gambling. Perhaps Officer Whatley's experience and knowledge of the neighborhood informed his observations when he made them, i.e., he knows gambling when he sees it. But once it was established that Officer Whatley saw the group of men gambling, the high gambling crime area designation could add nothing more to the equation.

I find perplexing the Majority's finding that the character of this neighborhood was particularly relevant in this case because Officer Whatley "suspected the group of gambling." Majority Op. at 27. Whether gambling is prevalent in that area or has never occurred in that area before, Officer Whatley observed men gambling. Even if Lewis was in a neighborhood where illegal gambling was rampant, this fact does not tend to make it more probable that Lewis himself was engaged in gambling. Thus, in my view, not only did the Commonwealth fail to introduce evidence that would justify the categorization of the area as a "high-crime area," it failed to establish any basis to consider it as a relevant fact tipping the scales in the reasonable suspicion analysis in this case.

The second factor the Commonwealth relied on to support its reasonable suspicion analysis was that Lewis was with men who appeared to be gambling. Gambling on a City of Philadelphia sidewalk is prohibited under the Philadelphia Code, as is setting up a gambling operation, attempting to gamble, or inciting others to gamble. Philadelphia Code, § 10-612(1), (2). Therefore, if the Officers observed Lewis engaged in gambling or related offenses, this would support a finding of reasonable suspicion to believe that criminal activity was afoot. Significantly, Officer Whatley testified that he did not recall

seeing Lewis gambling; Lewis was just with a group of individuals that were. N.T., 12/8/2021, at 13. Officer Brush, who ultimately chased Lewis down, observed only a group of men. He did not see anyone gambling, let alone Lewis.[5] *Id.* at 23. As is clear from the testimony, the Officers' belief was that men were gambling near Lewis, not that Lewis was engaged in illegal gambling or related offenses. These vague allegations cannot suffice to establish individualized suspicion with regard to Lewis (as opposed to the men he was with).[6] As Justice Dougherty thoughtfully explained in *Jackson*,

---

[5] Given that Officer Brush, the arresting officer, did not see gambling or provide any specific testimony to support the prevalence of gambling in this neighborhood, the circumstances supporting reasonable suspicion were largely established by Officer Whatley's testimony. The Majority and lower courts imputed all of Officer Whatley's knowledge and observations to Officer Brush, and Lewis has not challenged the Commonwealth's reliance on the collective knowledge doctrine in this case. *See Commonwealth v. Yong*, 177 A.3d 876 (Pa. 2018) (providing that the knowledge of one officer may be imputed onto another for purposes of determining whether the arresting latter officer had probable cause to justify the arrest).

[6] This Court has never held that a person may be seized merely based on evidence that he was present when a crime was taking place, nor has the Commonwealth asked us to do so here, as that would violate the fundamental requirement that reasonable suspicion be individualized. Because suspicion based on an individual's mere proximity to criminal activity is not "individualized," the United States Supreme Court has rejected this sort of argument. *See Ybarra v. Illinois*, 444 U.S. 85, 93 (1979) (rejecting state's argument that on "compact premises," i.e., a tavern, subject to a narcotics search warrant, there is reasonable suspicion that all persons present are connected with drug trafficking or may be concealing or carrying away the contraband to justify a *Terry* frisk). Nonetheless, Justice Wecht suggests that mere presence with others engaged in criminal activity establishes reasonable, articulable suspicion as to **each** member of the group. Concurring & Dissenting Op. at 26-27 (Wecht, J.). Justice Wecht offers no legal support for his bright-line rule but instead, justifies his novel conclusion with an analogy to hot potato, where "perhaps only one player is holding the potato, but all of the players in the circle are playing the game." *Id.* at 27. This analogy has little persuasive force because in hot potato, you do not stand in the circle unless you are playing. By contrast, gambling with playing cards – of which there are fifty-two, not one – is not confined to an exclusive circle, and one passing by can stop to see what is happening, or spectators or friends may hang out and keep people company by standing amongst the circle of individuals. A comparison to hot potato adds nothing to determining whether a person standing with a group playing cards without cards or money in their hands could be playing. The inapt analogy to hot potato does not justify Justice Wecht's broad and novel conclusion that (continued…)

"reasonable suspicion of criminal activity … is alone not sufficient to support an investigative stop. The detaining officer must also have reasonable suspicion 'that the particular individual being stopped is engaged in [the] wrongdoing.'" *Jackson*, 302 A.3d at 765 (Dougherty, J., OISR) (quoting *Kansas v. Glover*, 589 U.S. 376 (2020) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981))).

The only remaining consideration weighing in favor of the suppression court's reasonable suspicion analysis was Lewis's flight. Flight accompanied by the non-individualized allegations that Lewis was with people who were gambling does not give rise to the requisite lawful reasonable suspicion to subject him to an investigatory detention. *Commonwealth v. DeWitt*, 608 A.2d 1030, 1034 (Pa. 1992) ("We would be hard pressed to find that flight, in and of itself, constitutes reasonable suspicion of criminal conduct."). Because there was no individualized evidence to suggest that Lewis was gambling or involved in unlawful activity, the police were not justified in giving chase. Because the unlawful chase coerced Lewis into abandoning his bag, the contents of the bag were subject to suppression. To reiterate, I would take this opportunity to clarify that a police officer's assertion that a certain location is a high-crime area must be objectively supported, i.e., with empirical data and particularized to the defendant through a showing of relevance. Because the Commonwealth has failed to meet its burden of establishing reasonable articulable suspicion to support the seizure of Lewis, I respectfully dissent.

---

merely being among a group of people gambling raises reasonable suspicion as to each member of the group. *Id.* at 26.

Moreover, Justice Wecht claims that the suspicion was individualized as to Lewis, and he supports his claim by repeating the facts from the testimony at the suppression hearing: Lewis was standing on the sidewalk around the steps of a house with a group of men who were gambling, some with cards and money. *Id.* at 27. His repetition of the facts reminds us that neither officer reported suspicious conduct on Lewis' part other than that he was present while others were gambling.