J-A19038-19

2019 PA Super 297

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LINZIE BROGDON | : | |
| | : | |
| Appellant | : | No. 1276 EDA 2018 |

Appeal from the Judgment of Sentence April 6, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001708-2017

BEFORE: PANELLA, P.J., KUNSELMAN, J., and STEVENS*, P.J.E.

OPINION BY STEVENS, P.J.E.: **FILED OCTOBER 03, 2019**

Appellant, Linzie Brogdon, appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia following his conviction at a bench trial on the charges of persons not to possess firearms, firearms not to be carried without a license, carrying firearms on a public street, and resisting arrest.[1] After a careful review, we affirm.

The relevant facts and procedural history are as follows: During the evening of October 29, 2016, on the 2900 block of Howard Street in Philadelphia, John Gonzalez was robbed at gunpoint. Appellant was arrested in connection with the robbery, and on July 10 and 14, 2017, Appellant,

---

[1] 18 Pa.C.S.A. §§ 6105, 6106, 6108, and 5104, respectively.

---

\* Former Justice specially assigned to the Superior Court.

represented by counsel, litigated a motion to suppress the physical evidence seized by the police.[2]

At the suppression hearing, the Commonwealth presented the testimony of Police Officer Stephen Bennis and Detective Matthew Hagy.[3] Specifically, Officer Bennis testified that, on October 29, 2016, "there was a robbery, point-of-gun, at the 2900 block of North Howard[.]" N.T., 7/10/17, at 8. Officer Bennis described the 2900 block of Howard Street as "[o]ne of the most violent, high drug areas in the 25th District and probably in the City." *Id.* at 17.

On October 30, 2016, Detective Hagy and a sergeant informed Officer Bennis that, in connection with the robbery, the police were attempting to "identify an offender who went by the nickname of Fifty. And they provided [Officer Bennis with] a physical description of a tall, black male, approximately 6'4"/6'5"." *Id.* at 9. Officer Bennis testified that, based on the information provided to him, he had "an idea who they were talking about." *Id.*

Specifically, Officer Bennis indicated that, in reference to the 2900 block of Howard Street, he was familiar with Appellant, who matched the description provided by Detective Hagy and the sergeant. *Id.* Officer Bennis explained

---

[2] The certified record contains neither a pre-trial suppression motion nor a docket entry related to the filing thereof. However, this Court has been provided with the transcripts related to Appellant's litigation of his suppression motion.

[3] Appellant presented no witnesses.

that, during the past three years of his career, he has routinely patrolled Howard Street and, approximately once or twice a day, he observes Appellant in the 2900 block of Howard Street near the Chinese store or the bodega. *Id.* at 10, 17. Officer Bennis indicated Appellant resides on the 2800 block of Howard Street, which is just one block south of where the robbery occurred. *Id.* at 10.

Officer Bennis testified he provided Detective Hagy and the sergeant with information regarding Appellant, and at some point during his tour of duty on October 30, 2016, he returned to the police station where his fellow police officers informed him witnesses had positively identified Appellant as being involved in the robbery. *Id.* Thereafter, at around 9:00 p.m. on October 30, 2016, as Detective Hagy and the sergeant were in the area of the robbery attempting to recover video, they observed Appellant. *Id.* at 11. Accordingly, they provided "flash information"[4] indicating they had observed the male, Appellant, who is also known as "Fifty." *Id.* Using the police radio, Officer Bennis asked for Appellant's specific location, and the sergeant indicated Appellant was "in the area of A and Tusculeum[,]" which is approximately two blocks from the 2900 block of Howard Street. *Id.*

_____

[4] "Flash information" is generally based on a report from investigating officers and is broadcast to other police units in the district. *Commonwealth v. Jackson*, 519 A.2d 427, 431 (Pa.Super. 1986).

Officer Bennis and his partner proceeded to the 2900 block of Howard Street where they saw Appellant travelling southbound on a bicycle. *Id.* Officer Bennis and his partner exited their patrol vehicle, stopped Appellant, removed him from the bicycle, and walked him towards the police vehicle. *Id.* at 11-12. As the officers escorted Appellant towards the back of the police vehicle, Appellant "locked up his arms and began reaching towards his jacket, actively resisting [the officers'] attempts to place him into custody." *Id.* at 12. As the two officers struggled to place handcuffs on Appellant, the trio fell to the ground, at which point Officer Bennis' partner placed Appellant's left hand into a handcuff. *Id.* As the officers attempted to place the handcuff on Appellant's right hand, Appellant continued to struggle and reach into his jacket. *Id.* With the additional assistance of Detective Hagy and the sergeant, who had arrived on the scene, the officers handcuffed Appellant's right hand behind his back, at which point a firearm fell out of Appellant's jacket. *Id.* at 13.

The officers retrieved the firearm from the ground and discovered it was loaded with one live round in the chamber and four in the magazine. *Id.* at 14. The officers then searched Appellant's person and recovered thirteen clear, ziplock packets containing a blue glassy insert. The inserts were stamped "PR," and they contained an off-white powdery substance. *Id.* The police also seized a red and black mountain bicycle, which Appellant had been

riding, and his canvas shoulder bag, as well as $36.00 from Appellant's person. *Id.* at 14-16.

On cross-examination, Officer Bennis confirmed that, when he and his partner saw Appellant on the bicycle during the evening of October 30, 2016, they were in a marked patrol car. *Id.* at 19. Appellant was biking southbound on Howard Street while the officers were driving northbound. *Id.* Officer Bennis confirmed that he and his partner approached Appellant because they believed he had been involved in the previous night's robbery. *Id.* at 20. Officer Bennis indicated the officers did not approach Appellant with guns drawn; but rather, Officer Bennis stopped Appellant by quickly exiting the police vehicle and stepping in front of the bicycle, which Appellant was riding. *Id.* at 21. Officer Bennis confirmed that Appellant stopped the bicycle and Appellant dismounted with the officer "maintaining a hold on him." *Id.* at 22. Appellant then dropped the bicycle to one side and, as the officers attempted to handcuff him, Appellant struggled while attempting to reach into his jacket. *Id.* at 22-23. Officer Bennis reiterated that, during the struggle, a loaded handgun fell out of Appellant's jacket. *Id.* at 24.

On redirect-examination, Officer Bennis explained that the handgun fell out of Appellant's left coat pocket, which was the pocket that Appellant kept attempting to reach into during the struggle. *Id.* at 25. On recross-examination, Officer Bennis admitted that, prior to stopping Appellant, he did

not observe a "bulge" in Appellant's jacket; however, he testified "the interaction went from casual to fighting within a second or so." *Id.*

Detective Hagy testified that he was the lead investigator assigned to the robbery case, and after gathering information from the victim, Mr. Gonzalez, he interviewed Reginald Carroll at approximately 4:00 a.m. on October 30, 2016. N.T., 7/14/17, at 6-7. Mr. Carroll informed Detective Hagy that "a male with the nickname of Fifty" was involved in the robbery; Mr. Carroll described "Fifty" as a black male who was 6'5" tall. *Id.* at 7, 10. Moreover, on October 30, 2016, at approximately 5:45 p.m., a witness, Anna Gomez, arrived at the police station of her own volition, and in the presence of Detective Hagy, she reported that "three males [were] involved [in the robbery] and the male that pushed John Gonzalez off the bike, his nickname was Fifty." *Id.* at 9.

Detective Hagy testified that, in response to Mr. Carroll and Ms. Gomez informing him a man with the nickname of "Fifty" was involved in the robbery, he spoke with Officer Bennis, who routinely patrolled the area where the robbery occurred. *Id.* Detective Hagy indicated that:

> Based on the flash and the nickname, [Officer Bennis] gave us the name of a male by the name of [Appellant]—I believe he just said by the [last] name of Brogdon. I was able to go into the police system and I found a male by the name of Brogdon who lived at 2955 Howard Street and also the male was approximately 6'5". Based on that, I developed two photo arrays with [Appellant] as one of the males.

*Id.* at 10. Detective Hagy confirmed that Appellant matched the description provided by Mr. Carroll. *Id.* at 11.

Detective Hagy testified a fellow officer showed the photo arrays to Ms. Gomez at 7:30 p.m. and to Mr. Carroll at 7:55 p.m. on October 30, 2016. *Id.* at 12. The fellow officer reported that both individuals chose Appellant's photo from the array. *Id.* at 12-13. Detective Hagy then informed Officer Bennis and his partner of the positive identifications and requested they be on the lookout for Appellant, who was considered to be armed. *Id.* at 13. Meanwhile, Detective Hagy, along with the sergeant, proceeded to the Chinese store on the corner of Howard and Cambria to determine whether there was video of the robbery. *Id.* at 14.

On cross-examination, Detective Hagy confirmed that, shortly after the robbery, he interviewed Mr. Gonzalez, who reported he was robbed by two males, one of whom pointed a handgun at him. *Id.* at 15-16. Mr. Gonzalez reported that one of the men was wearing black pants and a black hoodie while the other man was wearing blue jeans and a black hoodie. *Id.* Mr. Gonzalez indicated the two men had taken his wallet and cell phone. *Id.* Detective Hagy confirmed that Mr. Gonzalez told him he was pushed off of his bicycle during the robbery, he ran away on foot, and he flagged down a police vehicle. *Id.* at 17. The police then transported Mr. Gonzalez back to the scene. *Id.*

Upon further cross-examination, Detective Hagy testified as follows:

**Q.** While they were transporting [Mr. Gonzalez] back to the scene, he actually points out to those officers, there is the man who pointed the gun at me, right?

**A.** Correct, he was actually in the back of our car at that point. He was too afraid to walk down the street on his own, so we put him in our unmarked car. While we were at the scene, and I was taking photographs of the scene and processing the scene, [Mr. Gonzalez] saw one of the males that he thought was involved, yes.

**Q.** Who was in the car that he pointed that male out to, if you were checking out the scene?

**A.** There were two officers that were at the scene with me—I would have to look, I forget their names—who drove off and stopped the male. And then they came over police radio and asked us to take [Mr. Gonzalez] to that location, I think it was the next block over. We went to that location and positively ID'd one of the males.

**Q.** The male that [Mr. Gonzalez] identified as having robbed [him was] Reginald Carroll, correct?

**A.** That is correct.

**Q.** Mr. Carroll was taken to East Detectives and also gave a statement?

**A.** Yes.

**Q.** That statement was videotaped, correct?

**A.** That's correct.

**Q.** There are no written records of that? There is not a 75483 for that, right?

**A.** No.

**Q.** In the course of that interview, Mr. Carroll told either you or other officers involved in the case that it was [Appellant], also known as Fifty, who was involved in the robbery of [Mr. Gonzalez], right?

**A.** That is correct.

**Q.** In other words, the very individual who has been accused by the complainant of robbing him says, no, it wasn't me, it was Fifty?

**A.** Yes, and he gave a second male also.

**Q.** And you have reason to believe that the second male is Kareem Davis?

**A.** That's correct.

**Q.** At that point, the only person that you have identifying [Appellant] as having been involved in this robbery is the one who is actually accused by the complainant, right?

**A.** At that point, yes.

**THE COURT:** At what point are we talking about? You said at this point, I am trying to figure out how it pertains to the stop.

**THE WITNESS:** At 4:00 a.m., Reginald Carroll was interviewed and the post-[M]iranda statement—

**THE COURT:** 4:00 a.m. on the 30th?

**THE WITNESS:** Yes, of the 30th.

**THE COURT:** There was a stop that evening?

**THE WITNESS:** Yes, he said a male by the name of Fifty. And then Anna Gomez showed up later that night at 5:45 p.m. She just showed up and—

**THE COURT:** I just wanted to get my timeline straight.

**[DEFENSE COUNSEL]:** May I continue, Your Honor?

**THE COURT:** Of course.

**Q.** Detective, it is about 12/13 hours after Reginald Carroll gives his statement that Ms. Gomez walks into East Detectives, right?

**A.** Yes.

**Q.** I think you said you were present for the taking of the statement by Detective Curet?

**A.** Yes.

**Q.** Nowhere in this interview do we learn anything about the relationship between Ms. Gomez and Mr. Carroll, correct?

**[ADA]:** Objection to relevance.

**THE COURT:** Overruled.

**THE WITNESS:** Carroll and—no, no.  She was a friend of [Mr.] Gonzalez.

**Q.** I phrased the question slightly awkward.  I think you understood it and answered it properly, but suffice [it] to say, you

- 9 -

do not know what the relationship is at this point between—and by this point, I mean at the taking of the statement—

> **THE COURT:** 4:00/5:00 in the morning on the 30th?
>
> **[DEFENSE COUNSEL]:** 5:00 in the evening, Your Honor.
>
> **THE COURT:** You are talking about [Ms.] Gomez?
>
> **THE WITNESS:** Yes, [Ms.] Gomez came in at 5:45 p.m.

**Q.** When Anna Gomez gives her statement, you do not know about the relationship between her and Mr. Carroll?

**A.** No.

**Q.** Ms. Gomez told you that contrary to what the complainant had told you, that there were actually three males involved in robbing [Mr.] Gonzalez, the complainant, right?

**A.** According to [Ms. Gomez], [Appellant] was the one that pushed [Mr. Gonzalez] off the bike and was going through the stuff robbing him. The other two males chased him and she heard gunshots.

***

**Q.** Ms. Gomez described the two—actually Ms. Gomez described the two males that chased after [Mr. Gonzalez] as being about 5'5" in height, correct?

**A.** Yes.

**Q.** Fair to say that [Appellant] is significantly taller than that, correct?

**A.** No, she said that two males that chased [Mr. Gonzalez] were about 5'5". She said that the male that pushed him off the bike was six-feet tall.

**Q.** I am just establishing for the record that [Appellant] is well over six-feet tall, correct?

**A.** Yes.

*Id.* at 17-22. Detective Hagy confirmed that the police were unsuccessful in retrieving video of the robbery. *Id.* at 23.

Based on the aforementioned, the suppression court denied Appellant's motion to suppress the physical evidence seized by the police. Specifically,

the suppression court concluded Officer Bennis had probable cause to arrest Appellant and properly search Appellant's person incident to the arrest. On November 27, 2017, Appellant proceeded to a bench trial at which Officer Bennis was the sole witness. At the conclusion of the trial, the trial court convicted Appellant of the offenses indicated *supra*, and on April 6, 2018, the trial court sentenced Appellant to an aggregate of four years to eight years in prison, to be followed by five years of probation. This timely, counseled appeal followed, and all Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant presents the following issue in his "Statement of the Questions Involved" (verbatim):

> I.    Did not the lower court err by denying appellant's motion to suppress physical evidence where the police officer who seized appellant and arrested him did not himself have independent reasonable suspicion or probable cause sufficient to detain and arrest, but did so based upon information supplied by a detective who himself did not have reasonably trustworthy evidence supporting the claim that appellant had been involved in a robbery?

Appellant's Brief at 3.

We consider Appellant's question mindful of the following:

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are

erroneous. Where…the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the [legal conclusions of the suppression court] are subject to plenary review.

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa.Super. 2017) (brackets and citation omitted).

On appeal, in the argument portion of his brief, Appellant concedes that Officer Bennis was permitted to make a warrantless arrest of Appellant, and search him incident to the arrest, if Detective Hagy had probable cause to arrest Appellant. Appellant's Brief at 11-12, 15-16 (citing *Commonwealth v. Yong*, 644 Pa. 613, 177 A.3d 876 (2018) (holding that where there is evidence two officers are working as a team, and one of them has probable cause to stop or arrest an individual, that knowledge can be imputed to the officer who makes the arrest, even without evidence that it was actually conveyed); *Commonwealth v. Kenney*, 449 Pa. 562, 297 A.2d 794 (1972) (holding the collective knowledge doctrine dictates that an officer making a warrantless arrest based on orders from a superior officer need not have probable cause so long as the superior officer had probable cause for the arrest)). That is, Appellant concedes that Officer Bennis was permitted to rely on the information known by Detective Hagy in effectuating the arrest of Appellant without himself independently viewing criminal activity. *See* Appellant's Brief at 11-12, 15-16.

However, Appellant contends Detective Hagy had no such probable cause to arrest Appellant. In this vein, Appellant avers the information obtained by Detective Hagy from Mr. Carroll and Ms. Gomez was "not reasonably trustworthy" since they had an obvious "corrupt motive" in identifying Appellant as one of the robbers (*i.e.*, Mr. Carroll was identified as one of the perpetrators by the victim and Ms. Gomez was allegedly in a romantic relationship with Mr. Carroll). ***See id.*** Assuming, *arguendo*, that Officer Bennis subjected Appellant to a custodial detention when he stepped in front of Appellant's bicycle, maintained a hold on Appellant, and handcuffed him, we agree with the trial court that the custodial detention was supported by the necessary probable cause. ***See Commonwealth v. Thompson***, 604 Pa. 198, 985 A.2d 928 (2009) (holding law enforcement officers must have probable cause to conduct an arrest).

> Probable cause is made out when the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime. The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require only a probability, and not a *prima facie* showing, of criminal activity. In determining whether probable cause exists, we apply a totality of the circumstances test.

***Thompson***, 604 Pa. at 931, 985 A.2d at 931 (citations, quotations, and quotation marks omitted). "Probable cause does not require certainty, but rather exists when criminality is one reasonable inference, not necessarily

even the most reasonable inference." ***Commonwealth v. Spieler***, 887 A.2d

1271, 1275 (Pa.Super. 2005).

Here, in concluding probable cause existed to arrest Appellant, the

suppression court relevantly indicated the following:

> [T]he Commonwealth established that[,] following the robbery of John Gonzalez, police apprehended Reginald Carroll. [Mr.] Gonzalez accused [Mr.] Carroll of participating in the robbery. Police also interviewed Anna Gomez, who told police that Appellant participated in the robbery. Both [Mr. Carroll and Ms. Gomez] selected photographs of Appellant [from a photo array]. This information was sufficient to establish probable cause regardless of any alleged relationship and [Mr.] Carroll's purported involvement in the robbery.
>
> With respect to Anna Gomez, the Courts of this Commonwealth have recognized that a citizen informer, identified eyewitness[,] or ordinary citizen reporting his or her observations of a crime stands on a different ground than a police informer. ***See Commonwealth v. Weidenmoyer***, 518 Pa. 2, 9, 539 A.2d 1291, 1295 (1988) ("It may be fairly stated that where an informant is not a paid, unknown tipster but instead an identified eyewitness to a crime who voluntarily reports observations to the police, the trustworthiness of such a person may be presumed."); ***Commonwealth v. Lyons***, [622 Pa. 91, 112,] 79 A.3d 1053, 1064-65 (2013) ("This Court has repeatedly rejected the argument that an officer relying on statements from an ordinary citizen, in contrast to a police informant, must establish the citizen's credibility and reliability."). Indeed, as [the appellate court] has held, such citizen reports are "particularly compelling" because "[m]embers of a particular neighborhood are uniquely well-qualified to observe what is going on in their community, and should be supported in reporting [criminal] activity to the police." ***Commonwealth v. Dennis***, 612 A.2d 1014, 1016 (Pa.Super. 1992).
>
> Thus, based solely on the information received from Anna Gomez, police had probable cause to arrest Appellant. Nevertheless, they had additional information, namely, the information from an alleged accomplice to the robbery. The law is clear that uncorroborated information from an accomplice establishes probable cause to arrest. ***Commonwealth v.***

> *Stokes*, [480 Pa. 38,] 389 A.2d 74, 76 (1978) ([holding] it is well settled that the uncorroborated confession of an accomplice which implicates the suspect will supply the probable cause for an arrest warrant).
>
> In numerous cases, information of the kind introduced during the suppression hearing herein has been deemed sufficient to sustain an order denying a motion to suppress. *See Commonwealth v. Bryant*, 503 A.2d 39 (Pa.Super. 1986) ([holding] probable cause to arrest [the] defendant for robbery of bar where suspect in different robbery told police that [the] defendant's accomplice had admitted [to the] robbery of [the] bar); *Commonwealth v. Rutigliano*, 456 A.2d 654 (Pa.Super. 1983) (where a neighbor volunteered information about identity of burglar, probable cause to arrest [the] defendant [was] established, and there was no need to establish [the] neighbor's credibility).
>
> Accordingly, for the reasons stated,…the [suppression] court find[s] Appellant's [suppression] claim lacking in merit because the police certainly had sufficient information to establish probable cause to arrest Appellant.

Suppression Court Opinion, filed 12/6/18, at 6- 8 (some citations omitted).

We conclude the suppression court's factual findings are supported by the record, and we agree with the suppression court's sound analysis. *Smith*, *supra*. "While the [police] must have a reasonable belief in the probability of criminal activity by the person to be arrested, the belief may rest solely in information supplied by another person where there is a 'substantial basis' for crediting that information." *Rutigliano*, 456 A.2d at 657 (quotation marks and quotation omitted). Here, the police had a "substantial basis" for crediting the information provided by Ms. Gomez, whose trustworthiness as an identified civilian witness may be presumed, as well as the information provided by Mr. Carroll, an alleged accomplice of Appellant. *See*

- 15 -

*Commonwealth v. Harris*, 176 A.3d 1009, 1017 (Pa.Super. 2017) (noting "that information provided by certain classes of persons may be sufficient to establish probable cause: the uncorroborated confession of an accomplice, or the statement of a victim, or an eyewitness whose identity is known.") (citation omitted)).

Moreover, we note that we are not persuaded by Appellant's argument that the information provided by Ms. Gomez and Mr. Carroll should be deemed "inherently untrustworthy" since there were discrepancies between their statements of events as compared to Mr. Gonzalez's statement of events. *See* Appellant's Brief at 14-15. As indicated *supra*, probable cause does not require certainty, but rather a reasonable inference. *See Spieler*, *supra*. Here, the suppression court did not err in concluding that, under the totality of the circumstances, a reasonable inference that Appellant committed the crime existed so as to establish probable cause to arrest him.[5] *See Thompson*, *supra*.

For all of the foregoing reasons, we affirm.

Affirmed.

---

[5] Having concluded the police had probable cause to arrest Appellant, we note Appellant was properly searched incident to his arrest. *See Commonwealth v. Simonson*, 148 A.3d 792 (Pa.Super. 2016) (explaining "search incident to arrest" exception).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/3/19</u>