J-S04036-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ABBAS PARKER | : | |
| | : | |
| Appellant | : | No. 548 EDA 2023 |

Appeal from the Judgment of Sentence Entered October 25, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008483-2018

BEFORE: BOWES, J., STABILE, J., and LANE, J.

MEMORANDUM BY LANE, J.: **FILED MAY 22, 2024**

Abbas Parker ("Parker") appeals from the judgment of sentence imposed following his convictions for first-degree murder, conspiracy to commit murder, possession of an instrument of crime, carrying a firearm without a license, and carrying a firearm in public in Philadelphia.[1] We affirm.

Parker and Sherman Williams ("the decedent") were both rap musicians who grew up in the same Philadelphia neighborhood and were familiar with one another. In May 2017, Parker became angry about a "rap diss" that the decedent released about Parker on the decedent's Instagram page. On the evening of September 11, 2017, the decedent was driving a scooter on North 22nd Street in Philadelphia when he was shot six times at close range, resulting in his death. Responding police officers learned from an eyewitness

---

[1] *See* 18 Pa.C.S.A. §§ 2502, 903, 907(a), 6106(a)(1), 6108.

that the shooter got into a white Jeep Cherokee and fled the scene after the murder. The eyewitness provided the vehicle's license plate number and, upon investigation, police learned that it was registered to an individual at 3234 North Sydenham Street in Philadelphia. Officers went to that address, observed the vehicle on the street, and obtained a search warrant for the premises.

In their search of the premises, police recovered a cellphone. Police then obtained a search warrant for the cellphone and determined that it was owned by Parker. The search of the cellphone revealed that, in the days leading up to the murder, Parker saved screenshots of the decedent's Instagram page, a photo of the decedent in front of his home, and the Redfin page associated with the decedent's home. Police recovered surveillance video of the shooting from a nearby church and pole camera. A Philadelphia homicide detective, Special Agent Brian Peters,[2] was familiar with Parker and identified him as the shooter from the surveillance videos. Police arrested Parker and charged him with murder and related offenses. During the ensuing investigation, police discovered that after the murder, Parker created two rap music videos, "Bloodos" and "Notorious," in which the lyrics recounted a

---

[2] At the time of the murder, Special Agent Peters was the assigned detective on the murder case; however, at the time of trial, he was a special agent in the Attorney General's office.

murder by shooting that was committed under circumstances similar to those surrounding the decedent's murder.

In February 2020, the Commonwealth filed a notice of its intent to admit, *inter alia*, the evidence from Parker's cellphone and the rap music videos of Parker performing "Bloodos" and "Notorious." In March 2020, Parker filed a motion *in limine* seeking to prohibit Special Agent Peters from identifying him in the surveillance videos. In September 2021, Parker filed a motion to suppress the evidence recovered from his cellphone on the basis that police lacked probable cause to obtain the warrant and the warrant was overbroad.

The trial court held multiple hearings on the pretrial motions. Special Agent Peters testified regarding his familiarity with Parker based on his numerous interactions with him over the years. *See* N.T., 2/18/20, at 120-23. Special Agent Peters further testified that he was able to identify Parker in the surveillance videos based on his prior personal interactions with Parker and his familiarity with Parker's mannerisms and tattoos. *See id*. at 123, 127. Based on this testimony, the trial court ruled that Special Agent Peters was permitted to provide identification testimony that it was Parker in the surveillance videos. *See* N.T., 3/13/20, at 4-5. The trial court also considered Parker's motion to suppress the evidence obtained from the search of his cellphone and denied it, finding as a matter of law that there was probable

cause for the search warrant and the warrant was sufficiently particular. **See** N.T., 9/23/21, at 4-5.

The matter proceeded to a jury trial at which the trial court allowed the Commonwealth to play the "Bloodos" video for the jury, with sound, and allowed a portion of the "Notorious" video to be played, without sound, for the purpose of showing Parker's movements and mannerisms.[3] **See** N.T., 10/20/22, at 21-23. At the conclusion of trial, the jury found Parker guilty of the above-referenced charges. The trial court immediately sentenced Parker to mandatory life in prison without the possibility of parole for first-degree murder.[4] Parker filed a post-sentence motion, which the trial court denied. Parker filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

Parker raises the following issues for our review:

1. Did the court below err in admitting the lyrics from [the] rap videos?

2. Did the court below err in not granting the motion to suppress evidence obtained from the search and seizure of [Parker's] cell[]phone?

---

[3] The trial court required the Commonwealth to redact all portions of the "Notorious" video which depicted guns, masks, violence, money, or other unlawful activity, so as to remove any potentially prejudicial material or sound from that video. **See** Trial Court Opinion, 5/2/23, at 4 n.5.

[4] The trial court imposed an aggregate consecutive sentence of twenty-five years and six months to fifty-seven years in prison for Parker's other convictions.

3. Did the court below err in allowing [Special A]gent Peters to identify [Parker] from the pole camera and church video when those identifications were not based solely on personal observation of [Parker] but, rather, were the product of collective knowledge of the police department and other law enforcement agencies?

4. Did the prosecutor commit prosecutorial misconduct in her closing?

Parker's Brief at unnumbered 6 (unnecessary capitalization omitted).

In his first issue, Parker challenges the trial court's decision to admit the lyrics from the rap video "Bloodos." In reviewing a challenge to the admissibility of evidence, our standard of review is well-settled and very narrow:

> Questions concerning the admissibility of evidence are within the sound discretion of the trial court and we will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. If in reaching a conclusion the trial court overrides or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

*Commonwealth v. LeClair*, 236 A.3d 71, 78 (Pa. Super. 2020) (citation omitted).

Relevance is the threshold for the admissibility of evidence. *See* Pa.R.E. 402. A court may exclude otherwise relevant evidence if its probative value is outweighed by its potential to cause unfair prejudice. *See* Pa.R.E. 403. However, evidence will not be excluded merely because it is harmful to the

defendant. *See Commonwealth v. Kouma*, 53 A.3d 760, 770 (Pa. Super. 2012) (noting that "exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based on something other than the legal propositions relevant to the case"). The court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand. *Id*.

Rap lyrics are a form of artistic expression which "may employ metaphor, exaggeration, and other artistic devices, and can involve abstract representations of events or ubiquitous storylines." *Commonwealth v. Talbert*, 129 A.3d 536, 541 (Pa. Super. 2015) (citation omitted). However, "these features do not exempt such writings from jury consideration where the lyrics describe details that mirror the crime charged." *Id*. (citation omitted); *see also id*. (concluding that the defendant's rap video was relevant to show his involvement in the murders at issue because the inconsistencies between the facts of the murders and the slang meaning of the words in the rap song were not significant enough to change the overall meaning of the rap lyrics); *Commonwealth v. Flamer*, 53 A.3d 82, 89 (Pa. Super. 2012) (holding that the trial court abused its discretion by finding defendant's rap lyrics to be irrelevant and prejudicial, where lyrics about people "keeping their mouths shut," sending friends to kill for him, and "popping shells" in people that "run their mouth" had a tendency to show a conspiratorial agreement to murder the Commonwealth's key witness before trial); *see also U.S. v.*

*Stuckey*, 253 Fed. Appx. 468, 482 (6th Cir. 2007) (concluding that rap lyrics were relevant because the lyrics concerning the killing of government witnesses were precisely what the government accused the defendant of doing). Indeed, "[t]o expect rap lyrics . . . to communicate a criminal event in precise detail would be wholly unreasonable." *Talbert*, 129 A.3d at 541 (citation omitted). Accordingly, "the courts of this Commonwealth have permitted the admission of rap lyrics where the content of those lyrics sufficiently dovetailed with real-world events and persons, so as to dispel the risk that the lyrics were purely fictional." *Commonwealth v. Lehman*, 275 A.3d 513, 521 (Pa. Super. 2022).

Parker asserts that the trial court abused its discretion by admitting the lyrics to the "Bloodos" video.[5] Parker points out that, whereas the trial court permitted the "Notorious" video to be played to the jury without sound, the

_____

[5] We observe that in both his concise statement and his statement of questions involved, Parker confined his first issue to the narrow question of whether the trial court abused its discretion in admitting the *lyrics* to the rap videos at trial. *See* Concise Statement, 3/16/23, at 1; *see also* Parker's Brief at unnumbered 6. As the lyrics to "Notorious" were not admitted at trial, Parker's first issue is necessarily confined to the admission of the lyrics to "Bloodos." However, in his brief, Parker impermissibly attempts expand his first issue to present a wider challenge to the admission of both videos, generally, and not merely to the lyrics of "Bloodos." As this broader question was not preserved for our review, we decline to address it. *See* Pa.R.A.P. 1925(b)(4)(vii) (providing that issues not included in the concise statement are waived); *see also* Pa.R.A.P. 2116(a) (providing that "[n]o question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby"); Pa.R.A.P. 302(a) (providing that issues not raised in the lower court are waived and may not be raised for the first time on appeal).

court nevertheless permitted the "Bloodos" video to be played to the jury in its entirety, with sound. Parker claims that "[t]he trial court was aware of the potential of unfair prejudice when it ordered "notorious to be played without audio . . . [but] [i]inexplicably, the court did not do the same with "Bloodos." Parker's Brief at unnumbered 17. Parker asserts that the content was "graphic and shocking," and theorizes that "[t]he emotional impact on the jury must have been significant." *Id*. at 17-18. Parker argues that the probative value of the lyrics was outweighed by the prejudicial effect on the jury. Parker contends that the lyrics were not a literal recounting of the murder but were more allegorical in nature.[6]

The trial court considered Parker's first issue and determined that it lacked merit. The trial court aptly reasoned:

> Here, [Parker] challenges the admission of lyrics from both rap videos, "Notorious" and "Bloodos." However, lyrics from "Notorious" were never presented at trial. . . .
>
> In "Bloodos", [Parker] raps several lyrics that mirror the actual events surrounding the decedent's murder. First, in the chorus of the song, [Parker] states, "broad day I shoot ya, I take ya head Medusa." The decedent was shot before 6 p.m. in early September, during daylight hours, on a busy thoroughfare next to an active shopping center. Furthermore, the decedent wore his hair in dreadlocks, which resemble the hair of Greek mythical figure Medusa.

---

[6] Parker additionally argues that the admission of the lyrics was unnecessary because the lyrics were cumulative of other evidence. However, our review of the record indicates that Parker's counsel failed to raise this argument before the trial court. *See* N.T., 2/18/20, at 87-95. Accordingly, the argument is waived. *See* Pa.R.A.P. 302(a).

Next, [Parker] raps that he "and Moss . . . pick you off["] as the music video pans to Malik West sitting next to [him]. Video evidence established that Malik West followed [Parker] immediately after [he] shot the decedent and that the two men returned to a residence on North Sydenham Street . . . immediately following the murder. Additionally, [Parker] raps that his last murder was "brutal" and "unsolved["."] The song was released in early 2018, while the case was still being investigated.

Next, [Parker] raps "best man get tha drop, shot with a hollow." The decedent was shot with .40 caliber Hornady ammunition. Police recovered a carton of Hornaday .40 caliber with seven remaining cartridges, all of which were hollow point, at the North Sydenham residence.

Finally, [Parker] raps that he does not care to aim because he "gets close." The decedent was shot at close range. In fact, eyewitness Greg[or]y Alston told detectives that [Parker] "stood over top of [decedent]" as he fired. Video evidence corroborates Mr. Alston's recollection showing [Parker] firing while standing directly over the decedent.

Therefore, in "Bloodos," [Parker] raps about a previous murder he committed that was "unsolved" right after a chorus that references shooting "Medusa" in broad daylight. He additionally references hollow point ammunition and shooting at close range. As stated above, each of these lyrics corresponded with details of the decedent's murder. As such, the lyrics sufficiently mirrored actual events enough to dispel risk that the lyrics were purely fictional. Accordingly, the lyrics of "Bloodos" were properly admitted and no relief is due.

Trial Court Opinion, 5/24/23, at 4-6 (citations omitted).

We discern no abuse of discretion by the trial court in admitting the lyrics to the "Bloodos" video. The lyrics described details that mirrored the crime charged and sufficiently dovetailed with the circumstances of the decedent's murder to such a degree that the unmistakable parallels between the lyrics and the decedent's murder dispelled any risk that the lyrics were

- 9 -

purely fictional. **See Lehman**, 275 A.3d at 521. While the admission of the lyrics may have been prejudicial, Parker has not shown that the lyrics were so prejudicial that they would inflame the jury to make a decision based on something other than the legal propositions relevant to the case. **See Kouma**, 53 A.3d at 770. Moreover, the trial court was not required to sanitize the evidence admitted at trial to eliminate the lyrics from the jury's consideration, particularly where those lyrics were relevant to the murder at issue. **Id**. Accordingly, Parker's first issue merits no relief.

In his second issue, Parker challenges the trial court's denial of his motion to suppress evidence obtained from the search of his cellphone. Our standard of review is well-established:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

> Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre[]trial motion to suppress.

***Commonwealth v. Carey***, 249 A.3d 1217, 1223 (Pa. Super. 2021) (citation omitted).

With respect to search warrants, our Supreme Court has explained:

It is a fundamental rule of law that a warrant must name or describe with particularity the property to be seized and the person or place to be searched . . .. The particularity requirement prohibits a warrant that is not particular enough and a warrant that is overbroad. These are two separate, though related, issues. A warrant unconstitutional for its lack of particularity authorizes a search in terms so ambiguous as to allow the executing officers to pick and choose among an individual's possessions to find which items to seize. This will result in the general "rummaging" banned by the [F]ourth [A]mendment. A warrant unconstitutional for its overbreadth authorizes in clear or specific terms the seizure of an entire set of items, or documents, many of which will prove unrelated to the crime under investigation. . .. An overbroad warrant is unconstitutional because it authorizes a general search and seizure.

***Commonwealth v. Orie***, 88 A.3d 983, 1002-03 (Pa. 2014).

However, search warrants should be read in a common sense fashion and should not be invalidated by hypertechnical interpretations. ***See Commonwealth v. Rega***, 933 A.2d 997, 1012 (Pa. 2007). This may mean that when an exact description of a particular item is not possible, a generic description will suffice. ***Id***. Where the items to be seized are as precisely identified as the nature of the activity permits, the searching officer is only required to describe the general class of the item he is seeking. ***Id***.

Moreover, when police are searching for items related to a crime, the warrant must be "sufficiently broad to encompass all of the items that possibly could contain material of evidentiary value." ***Commonwealth v. Johnson***,

42 A.3d 1017, 1032 (Pa. Super. 2012) (holding that, because police were not certain as to the details of the assault and could not know exactly what to specify in the warrant application, they needed only to describe the class of items to be seized). Further, where a warrant contains limiting language which only permits officers to search for evidence of a particular crime, it is specific enough to prevent rummaging or use of the warrant as a general investigatory tool. **See Commonwealth v. Green,** 265 A.3d 541, 555 (Pa. 2021).

Parker contends that the trial court erred in denying his motion to suppress the evidence found on his cellphone. Parker argues that the warrant to search his phone did not state with particularity what was to be searched, and instead simply stated an intent to search all digital communications.[7] Parker argues that this constituted an overbroad search of his phone.

The trial court considered Parker's second issue and concluded that it lacked merit. The court provided the following basis for its determination:

> As stated above, the police had probable cause to believe that evidence of the identity of the shooter could be found in the phones discovered at the Sydenham Street residence. Police encountered numerous individuals outside of [the] Sydenham Street residence, which was connected to a vehicle seen leaving the scene of the murder. Police specifically sought a search

---

[7] We note that instead of citing to the suppression hearing record, Parker has cited trial testimony to support his argument that the trial court erred in denying suppression. As explained above, when addressing a suppression challenge, we may only consider the suppression record and are unable to consider trial testimony in our review of the issue. **See Carey**, 249 A.3d at 1223.

warrant to "forensically examine the contents" of the phone in order to "assist in identifying potential witnesses, suspects, persons present at 3234 N Sydenham St[reet] and present inside the described Jeep Cherokee at the time of the shooting and immediately after." As such, police sought evidence in the phone that would help them identify persons connected to the vehicle and the murder. Logically, police could not know what form this information would take. Similarly, the police could not know when this information would have been placed on the phone, which would make any temporal limit to the search unreasonable. The police, therefore, described, as specifically as is reasonably possible, the items they sought. Namely, various digital files that would help them identify persons present inside the Jeep that fled the scene.

Furthermore, the wa[rr]ant explicitly limited the search to items "of evidentiary value to the investigation." Such limiting language winnowed the search to a particular crime, the decedent's murder, and did not grant police free rein to generally rummage for evidence of *any* crime.

Trial Court Opinion, 5/24/23, 10-11 (citations omitted, emphasis in original).

Based on our review, we conclude that the suppression court's factual findings are supported by the record and its legal conclusions drawn from those facts are free from error. Because the police were searching for items related to the decedent's murder and the identity of the individuals who fled the scene of the shooting to the residence at 3234 North Sydenham Street, the warrant needed to be sufficiently broad to encompass all items that could possibly contain material of evidentiary value. *See Johnson*, 42 A.3d at 1032. Given that the officers could only describe the general class of the items they were seeking, the warrant described the contents they were seeking as specifically as possible. Moreover, the warrant limited the search to information "of evidentiary value to this investigation." Search Warrant,

9/25/17, at unnumbered 1. Accordingly, the search warrant contained limiting language to prevent rummaging or its use as a general investigative tool. Thus, Parker's second issue merits no relief.

In his third issue, Parker challenges the trial court's denial of his motion to suppress Special Agent Peters' identification testimony. In addition to the above-noted standard of review for a suppression ruling, we observe that an officer's testimony regarding their identification of a defendant in surveillance video constitutes a lay opinion subject to Pa.R.E. 701, which states as follows:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a)    Rationally based on the witness's perception;
>
> (b) Helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (b)    Not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701.

"Generally, lay witnesses may express personal opinions related to their observations on a range of subject areas based on their personal experiences that are helpful to the factfinder." ***Commonwealth v. Berry***, 172 A.3d 1, 3-4 (Pa. Super. 2017). We have previously found it proper for a witness to offer a lay opinion as to the identity of an individual in security footage when the witness's identification is rationally based upon his or her own perception. ***See Commonwealth v. Palmer***, 192 A.3d 85, 100-01 (Pa. Super. 2018) (admitting lay opinion concerning identity of individual in surveillance videos

- 14 -

where "testimony about the [surveillance] videos was based upon [the witness's] perception of them, placed his subsequent actions in context, and was helpful in allowing the jury to reach a clear understanding of all his testimony").

Parker claims that Special Agent Peters' identification testimony was not based on his own perception but, instead, was a product of the collective knowledge of law enforcement. This theory is defined as follows:

> Where officers work together on an investigation, we have used the so-called "collective knowledge" theory to impute knowledge of one officer to others. We impute information if there has been "some degree of communication" between the officers. This requirement distinguishes officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject.

*Commonwealth v. Young*, 177 A.3d 876, 886 (Pa. 2018) (citations omitted).

Parker concedes that Special Agent Peters testified that he had up to ten contacts with Parker during the agent's tenure as a Philadelphia police detective in the homicide unit, and that Special Agent Peters further testified that, based on these contacts, he could independently identify Parker. Nevertheless, Parker contends that Special Agent Peters "also had the collective knowledge of law enforcement, and it is impossible to tease out one from the other. They are hopelessly intertwined." Parker's Brief at unnumbered 20. Parker argues that, although the collective knowledge doctrine applies in determining probable cause, "it does not exist in

- 15 -

identification cases[.]" *Id*. at unnumbered 21. Thus, Parker claims, "the doctrine is of no avail in Agent Peters['] mixed source identification of [Parker]." *Id*.

The trial court determined that Special Agent Peters' lay opinion identification testimony was properly admitted:

> While Special Agent Peters was not present at the North Sydenham residence or the church, his testimony was rationally based on his perception of the videos. Moreover, his testimony was helpful to the jury because Special Agent Peters was familiar with [Parker], his appearance, and his mannerisms.
>
> . . . Special Agent Peters consistently maintained that he had previous interactions and familiarity with [Parker]. Special Agent Peters testified that he knew [Parker] from his time with Central Detectives and was aware of [Parker] because of [his] membership in the rap group "Body Snatchers." He stated that he had known [Parker] for well over a decade since the mid-2000s. . . .
>
> As such, Special Agent Peters was familiar with [Parker's] appearance and mannerisms and, therefore, able to assist the jury in identifying him in the video[s].

Trial Court Opinion, 5/24/23, at 14-15 (citations omitted).

Based on our review, we conclude that the suppression court's factual findings are supported by the record and its legal conclusions drawn from those facts are free from error. At a suppression hearing, the court credited the testimony provided by Special Agent Peters regarding his interactions and dealings with Parker for more than a decade, starting in the early to mid-2000s. *See* N.T., 2/18/20, at 120-23. The agent explained that he worked for Central Detectives for eight years and that, during this time, he became

familiar with a street gang/rap group called the "Body Snatchers," of which Parker was an original member. *Id*. at 120. The agent explained that he had "at least 15 to 20" contacts with Parker, both in his neighborhood and also downtown Philadelphia at the courthouse. *Id*. at 121. The agent further indicated that at least four of those contacts were "good solid conversations" which were "not just, hey, what's up[?]" *Id*. at 122. According to the agent, at the time of the decedent's murder and ensuing investigation, he had known Parker for more than a decade and was able to recognize him through, *inter alia*, his mannerisms, tattoos, and his music. *Id*. at 123. Special Agent Peters specifically testified that, when he viewed the surveillance videos, he was able to recognize Parker. *Id*. at 124. Thus, the suppression record support's the court's finding that Special Agent Peters' identification was based on his rational perception of the surveillance videos. Parker points to no evidence in the suppression record that Special Agent Peters' identification was based on the opinions or knowledge of other law enforcement officers.[8] Accordingly, Parker's third issue lacks merit.

In Parker's fourth issue, he claims that the prosecutor committed prosecutorial misconduct in her closing argument by improperly vouching for

---

[8] We observe that Parker's discussion of his third issue is woefully underdeveloped. **See** Parker's Brief at unnumbered 20-21. Thus, had we not found it lacked merit, we would have found waiver of his third issue based on lack of development. **See Commonwealth v. Hardy**, 918 A.2d 766 (Pa. Super. 2007) (finding waiver of issues not adequately developed through discussion of pertinent case law and citation to the record).

Commonwealth witnesses. Specifically, the prosecutor stated, ". . . it is hard to be a witness to a crime. It is harder still to be a witness to a crime in Philadelphia. And it is harder yet to be a witness to a murder in Philadelphia." N.T., 10/24/22, at 115. Parker contends that these comments amounted to vouching for Commonwealth witnesses and constituted prosecutorial misconduct.

To preserve a claim of prosecutorial misconduct for appellate review, a defendant must raise a contemporaneous objection before the trial court, and then request either a mistrial or curative instructions. *See Commonwealth v. Barkman*, 295 A.3d 721, 740 (Pa. Super. 2023). Failure to raise a timely and contemporaneous objection results in waiver of the issue on appeal. *See Commonwealth v. Ali*, 10 A.3d 282, 293 (Pa. 2010); *see also* Pa.R.A.P. 302(a).

Our review of the record discloses that Parker's counsel did not raise a contemporaneous objection to these comments before the trial court, or thereafter request either a mistrial or curative instructions. *See Barkman*, 295 A.3d at 740; *see also Ali*, 10 A.3d at 293. Parker concedes that his

counsel did not object to these comments and did not request a curative instruction. **See** Parker's Brief at 21.[9] Accordingly, the issue is waived.[10]

Having found that each of Parker's issues is either meritless or waived, we affirm his judgment of sentence.

Judgment of sentence affirmed.

_____

[9] We observe that, in his concise statement, Parker suggested that his trial counsel may have been ineffective for failing to object to the prosecutor's statements. **See** Concise Statement, 3/16/23, at 2. However, Parker did not raise counsel's ineffectiveness in his statement of questions involved or elsewhere in his appellate brief. **See** Pa.R.A.P. 2116(a) (providing that "[n]o question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby"). In any event, claims of trial counsel's ineffectiveness are generally deferred to collateral review except in limited circumstances not herein applicable. **See Commonwealth v. Grant**, 813 A.2d 726 (Pa. 2002) (explaining general rule that petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review); **see also Commonwealth v. Holmes**, 79 A.3d 562, 563-64 (Pa. 2013) (recognizing two very limited exceptions to the general rule: (1) in extraordinary circumstances where claims of trial counsel's ineffectiveness are apparent from the record and immediate consideration best serves the interests of justice and/or (2) where there is good cause shown and review of the claim is preceded by a waiver of the right to seek collateral review).

[10] We observe that Parker's discussion of his fourth issue is also woefully underdeveloped. **See** Parker's Brief at unnumbered 21-24. Thus, had we not found waiver based on Rule 302(a), we would have found waiver of his fourth issue based on lack of development. **See Lackner v. Glosser,** 892 A.2d 21, 29-30 (Pa. Super. 2006) (holding that arguments which are not appropriately developed are waived).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/22/2024